453 F.2d 709
 Fed. Sec. L. Rep. P 93,300
GAF CORPORATION, Plaintiff-Appellant,
v.
Paul MILSTEIN et al., Defendants-Appellees.
 No. 280, Docket 71-1503.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 10, 1971.
Decided Dec. 13, 1971.
 
 Edwin J. Wesely, New York City (Winthrop, Stimson, Putnam & Roberts, New York City, Richard A. Horgan, Eugene Guenard McGuire, New York City, of counsel), for plaintiff-appellant.
 Louis Loss, Cambridge, Mass. (Stroock & Stroock & Lavan, New York City, David Lubart, Charles G. Moerdler, Stephen A. Block, Robert P. Stein, New York City, of counsel), for defendants-appellees.
 Before KAUFMAN and MANSFIELD, Circuit Judges, and LEVET, District Judge.*
 KAUFMAN, Circuit Judge:
 
 
 1
 This appeal involves the interpretation of section 13(d) of the Securities Exchange Act,[1] hitherto a largely unnoticed provision[2] added in 1968 by the Williams Act.[3] We write, therefore, on a relatively tabula rasa, despite the burgeoning field of securities law. Essentially, section 13(d) requires any person, after acquiring more than 10% (now 5%[4]) of a class of registered equity security, to send to the issuer and the exchanges on which the security is traded and file with the Commission the statement required by the Act.[5] Although the section has not attracted as much comment as section 14(d), also added by the Williams Act and requiring disclosure by persons engaging in tender offers, the section has potential for marked impact on holders, sellers and purchasers of securities.
 
 
 2
 GAF Corporation filed its complaint in the United States District Court for the Southern District of New York alleging that Morris Milstein, his two sons, Seymour and Paul, and his daughter, Gloria Milstein Flanzer, violated section 13(d) of the Securities Exchange Act first by failing to file the required statements and then by filing false ones. The complaint also alleged violation of section 10(b) based on the same false statements and, in addition, market manipulation of GAF stock. The Milsteins moved for dismissal under Rule 12(b) (6), F.R.Civ.P., on the ground that the complaint failed to state a claim on which relief could be granted or, in the alternative, for summary judgment under Rule 56. Judge Pollack aptly framed the issues involved:
 
 
 3
 The ultimate issue presented by the defendants' motion to dismiss the first count is whether, organizing a group of stockholders owning more than 10% of a class of equity securities with a view to seeking control is, without more, a reportable event under Section 13(d) of the Exchange Act; and as to the second count, whether in the absence of a connected purchase or sale of securities, the target corporation claiming violation of Section 10 and Rule 10b(5), has standing to seek an injunction against a control contestant for falsity in a Schedule 13D filing. (Footnote omitted.)
 
 
 4
 324 F.Supp. 1062, 1064-1065 (S.D.N.Y.1971). Judge Pollack granted the Milsteins' motion to dismiss under Rule 12(b)(6), and GAF has appealed. We disagree with Judge Pollack's determination that GAF failed to state a claim under section 13(d) and Rule 13d-1 promulgated thereunder, and thus reverse his order in this respect, but we affirm the dismissal of the second claim of the complaint on the ground that GAF, as an issuer, has no standing under section 10(b).
 
 
 5
 Before considering the merits of the issues involved on appeal, a statement of the facts as presented in the complaint and the briefs is in order.[6] We note also that in this posture of the proceeding we must accept as true all well pleaded allegations in the complaint.
 
 
 6
 The four Milsteins received 324,166 shares of GAF convertible preferred stock, approximately 10.25% of the preferred shares outstanding, when The Ruberoid Company, in which they had substantial holdings, was merged into GAF in May, 1967. They have not acquired any additional preferred shares since the merger.[7]
 
 
 7
 The complaint informs us that at some time after July 29, 1968, the effective date of the Williams Act,[8] the Milsteins "formed a conspiracy among themselves and other persons to act as a syndicate or group for the purpose of acquiring, holding, or disposing of securities of GAF with the ultimate aim of seizing control of GAF for their own personal and private purposes." It is necessary for our purposes to examine only a few of the nine overt acts GAF alleged were taken in furtherance of this conspiracy.
 
 
 8
 The complaint alleged that initially the Milsteins sought senior management and board positions for Seymour Milstein with GAF. When this sinecure was not forthcoming, the Milsteins allegedly caused Circle Floor Co., Inc., a company in their control, to reduce its otherwise substantial purchases from GAF.[9] It also charged that the Milsteins thereafter undertook a concerted effort to disparage its management and depress the price of GAF common and preferred stock in order to facilitate the acquisition of additional shares. On May 27, 1970, the Milsteins filed a derivative action in the district court, charging the directors, inter alia, with waste and spoliation of corporation assets. A companion action was filed in the New York courts. GAF further alleged that these actions were filed only to disparage management, to depress the price of GAF stock and to use discovery devices to gain valuable information for their takeover conspiracy.
 
 
 9
 In the meantime, the complaint tells us, Paul and Seymour Milstein purchased respectively 62,000 and 64,000 shares of GAF common stock. When GAF contended that the Milsteins were in violation of section 13(d) because they had not filed a Schedule 13D as required by Rule 13d-1, the Milsteins, although disclaiming any legal obligation under section 13(d), filed such a schedule on September 24, 1970. In their 13D statement (appended to the complaint), the Milsteins disclosed their preferred and common holdings and stated they "at some future time [might] determine to attempt to acquire control of GAF. . . ." They also stated that they had "no present intention as to whether or not any additional securities of GAF [might] be acquired by them in the future. . . ." Indeed, within the next two months, commencing with October 2, Paul and Seymour each purchased an additional 41,650 shares of common. The Milsteins thereafter filed a Restated and Amended Schedule 13D on November 10 to reflect these new purchases.
 
 
 10
 Then, on January 27, 1971, the Milsteins filed a third Schedule 13D, disclosing their intention to wage a proxy contest at the 1971 annual meeting. Although the statement again disclaimed any present intention to acquire additional shares, Paul purchased 28,300 shares of common stock during February, 1971. These last purchases, which brought the Milsteins' total common holdings to 237,600 shares having a value in excess of $2 million and constituting 1.7% of the common shares outstanding, were reflected in a February 23 amendment to the January 27 Schedule 13D.
 
 
 11
 The last essential datum for our purposes is the proxy contest. On May 10, 1971, it was announced that GAF management had prevailed at the April 16 meeting by a margin of some 2 to 1.[10]
 
 
 12
 GAF's complaint in this action filed on December 16, 1970, requested that the Milsteins be preliminarily and permanently enjoined from (1) acquiring or attempting to acquire additional GAF stock; (2) soliciting any proxy from a GAF shareholder to vote GAF stock; (3) voting any shares of GAF stock held or acquired during the conspiracy; and (4) otherwise acting in furtherance of the conspiracy. It asks for this relief "until the effects of the conspiracy have been fully dissipated and the unlawful acts committed pursuant to the conspiracy fully corrected. . . ."[11]I.
 
 
 13
 At the time the conspiracy allegedly was formed, section 13(d) (1) in relevant part provided:
 
 
 14
 Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 12 of this title . . ., is directly or indirectly the beneficial owner of more than 10 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement. . . .
 
 
 15
 This section, however, exempts from its filing requirements any acquisition which, "together with all other acquisitions by the same person of securities of the same class during the preceding twelve months, does not exceed 2 per centum of that class." Section 13(d) (6) (B). Section 13(d) (3), which is crucial to GAF's claim, further provides that "[w]hen two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of [section 13(d)]." On the assumption that the facts alleged in the complaint are true, we cannot conclude other than that the four Milsteins constituted a "group" and thus, as a "person," were subject to the provisions of section 13(d). We also are aware of the charge that the Milsteins agreed after July 29, 1968, to hold their GAF preferred shares for the common purpose of acquiring control of GAF. Furthermore, the individuals collectively or as a "group" held more than 10% of the outstanding preferred shares-a registered class of securities. Since the section requires a "person" to file only if he acquires more than 2% of the class of stock in a 12-month period after July 29, 1968,[12] the principal question presented to us is whether the complaint alleges as a matter of law that the Milstein group "acquired" the 324,166 shares of preferred stock owned by its members after that date. We conclude that it does and thus that it states a claim under section 13(d).
 
 
 16
 The statute refers to "acquiring directly or indirectly the beneficial ownership of securities." Thus, at the outset, we are not confronted with the relatively simple concept of legal title, but rather with the amorphous and occasionally obfuscated concepts of indirect and beneficial ownership which pervade the securities acts.
 
 
 17
 The Act nowhere explicitly defines the concept of "acquisition" as used in section 13(d). Although we are aware of Learned Hand's warning "not to make a fortress out of the dictionary," Cabell v. Markham, 148 F.2d 737, 739 (2d Cir.), aff'd, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945), some light, although dim, is shed by Webster's Third International Dictionary. It tells us that "to acquire" means "to come into possession [or] control." If the allegations in the complaint are true, then the group, which must be treated as an entity separate and distinct from its members, could have gained "beneficial control" of the voting rights of the preferred stock[13] only after its formation, which we must assume occurred after the effective date of the Williams Act. Manifestly, according to the complaint, the group when formed acquired a beneficial interest in the individual holdings of its members. We find ourselves in agreement with the statement of the Court of Appeals for the Seventh Circuit in Bath Industries, Inc. v. Blot, 427 F.2d 97, 112 (7th Cir. 1970), that in the context of the Williams Act, where the principal concern is focused on the battle for corporate control, "voting control of stock is the only relevant element of beneficial ownership." Thus, we hardly can agree with Judge Pollack that the language of the statute compels the conclusion that individual members must acquire shares before the group can be required to file.
 
 
 18
 We are well aware of the first catechism of statutory construction which teaches that we should begin the process of interpretation with "the language of the statute itself," see Jones v. Alfred H. Mayer Co., 392 U.S. 409, 420, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968); that, however, is toto caelo from saying that the process must end there or that we are required to blind ourselves to other relevant aids to construction, particularly when dealing with a statute as complex as the one before us. The wisdom of Learned Hand guides us again: "it is one of the surest indexes of a mature and developed jurisprudence . . . to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." Cabell v. Markham, supra, 148 F.2d at 739. See also United States v. Dickerson, 310 U.S. 554, 562, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940). We are, therefore, totally puzzled by the experienced trial judge's conclusion that "the legislative reports should not be resorted to here since the specific statutory language is clear. . . ." 324 F.Supp. at 1067. Indeed, the statute before us is anything but a model of clarity[14] and the ritualistic approach to statutory interpretation which the district judge suggests would close off the only light available to illumine the statute.
 
 
 19
 The legislative history, as well as the purpose behind section 13(d), bear out our interpretation. Any residual doubt over its soundness is obviated by the following clear statement appearing in both the House and Senate reports accompanying the Williams Act:
 
 
 20
 "[Section 13(d) (3)] would prevent a group of persons who seek to pool their voting or other interests in the securities of any issuer from evading the provisions of the statute because no one individual owns more than 10 percent of the securities. The group would be deemed to have become the beneficial owner, directly or indirectly, of more than 10 percent of a class of securities at the time they agreed to act in concert. Consequently, the group would be required to file the information called for in section 13(d) (1) within 10 days after they agree to act together, whether or not any member of the group had acquired any securities at that time." S.Rep.No.550, 90th Cong., 1st Sess. 8 (1967); H.R.Rep.No.1711, 90th Cong., 2d Sess. 8-9 (1968), U.S.Code Cong. & Admin. News, p. 2818 (Emphasis added.)
 
 
 21
 Indeed, Professor Loss, one of the foremost scholars of securities law, reached the same interpretation in his treatise, citing this passage. 6 L. Loss, Securities Regulation 3664 (Supp.1969).
 
 
 22
 The Senate and House reports and the Act as finally enacted, contrary to appellees' contention,[15] are entirely consistent in our view. This conclusion is buttressed by a consideration of the purpose of the Act. The 1960's on Wall Street may best be remembered for the pyrotechnics of corporate takeovers and the phenomenon of conglomeration. Although individuals seeking control through a proxy contest were required to comply with section 14(a) of the Securities Exchange Act and the proxy rules promulgated by the SEC, and those making stock tender offers were required to comply with the applicable provisions of the Securities Act, before the enactment of the Williams Act there were no provisions regulating cash tender offers or other techniques of securing corporate control. According to the committee reports:
 
 
 23
 "The [Williams Act] would correct the current gap in our securities laws by amending the Securities Exchange Act of 1934 to provide for full disclosure in connection with cash tender offers and other techniques for accumulating large blocks of equity securities of publicly held companies." S.Rep.No.550 at 4; H.R.Rep.No.1711 at 4, U.S.Code Cong. & Admin.News p. 2814.
 
 
 24
 Specifically, we were told, "the purpose of section 13(d) is to require disclosure of information by persons who have acquired a substantial interest, or increased their interest in the equity securities of a company by a substantial amount, within a relatively short period of time." S.Rep.No.550 at 7; H.R.Rep.No.1711 at 8, U.S.Code Cong. & Admin.News p. 2818. Otherwise, investors cannot assess the potential for changes in corporate control and adequately evaluate the company's worth.[16] See generally Comment, Section 13(d) and Disclosure of Corporate Equity Ownership, 119 U.Pa.L.Rev. 853, 854-55, 858, 865-66 (1971).
 
 
 25
 That the purpose of section 13(d) is to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control is amply reflected in the enacted provisions. Section 13(d) (1) (C) requires the person filing to disclose any intention to acquire control. If he has such an intention, he must disclose any plans for liquidating the issuer, selling its assets, merging it with another company or changing substantially its business or corporate structure. It is of some interest, moreover, that section 13(d) (6) (D) empowers the Commission to exempt from the filing requirements "any acquisition . . . as not entered into for the purpose of, and not having the effect of, changing or influencing the control of the issuer or otherwise as not comprehended within the purpose of [section 13(d)]." (Emphasis added.)
 
 
 26
 The alleged conspiracy on the part of the Milsteins is one clearly intended to be encompassed within the reach of section 13(d). We have before us four shareholders who together own 10.25% of an outstanding class of securities and allegedly agreed to pool their holdings to effect a takeover of GAF. This certainly posed as great a threat to the stability of the corporate structure as the individual shareholder who buys 10.25% of the equity security in one transaction.[17] A shift in the loci of corporate power and influence is hardly dependent on an actual transfer of legal title to shares, and the statute and history are clear on this.
 
 
 27
 In light of the statutory purpose as we view it, we find ourselves in disagreement with the interpretation of Bath Industries, supra, that the group owning more than 10%, despite its agreement to seize control, in addition, must agree to acquire more shares before the filing requirement of section 13(d) is triggered. The history and language of section 13(d) make it clear that the statute was primarily concerned with disclosure of potential changes in control resulting from new aggregations of stockholdings and was not intended to be restricted to only individual stockholders who made future purchases and whose actions were, therefore, more apparent.[18] See Comment, Section 13(d) and Disclosure of Corporate Equity Ownership, 119 U.Pa.L.Rev. 853, 869-72 (1971). It hardly can be questioned that a group holding sufficient shares can effect a takeover without purchasing a single additional share of stock.
 
 
 28
 Two "policy" considerations have been advanced against our interpretation.[19] First, the district judge warned that "[t]he inherent difficulty of ascertaining when a group was formed is akin to an attempt to grasp quicksilver." 324 F.Supp. at 1068. This supposed difficulty, however, would not be dissipated even under his view-that individual members must acquire more than 2% after July 29, 1968, before the group can be compelled to file. The court still would be required to determine whether the individuals indeed constituted a "group." But, we hardly envision this as an insuperable obstacle to stating a claim in a complaint. GAF, in order to succeed on the merits, will have to carry its burden of proof by a fair preponderance of the evidence. It will have to produce evidence establishing that the conspiracy came into being after July 29, 1968, with the purpose of seizing control. If GAF should succeed on the merits, any difficulty in pinpointing the precise date, as distinguished from an approximate time, when the conspiracy was formed and the group became subject to section 13(d) can be one of the elements considered by the district judge in fashioning appropriate equitable relief.
 
 
 29
 The Milsteins also caution us against throwing our hook into the water and catching too many fish-namely, hundreds of families and other management groups which control companies with registered securities and whose members collectively own more than 5% of a class of the company's stock. Although this problem is not part of the narrow issue we must decide, we cannot close our eyes to the implications of our decision. Upon examination, however, the argument while superficially appealing proves to be totally without substance. Management groups per se are not customarily formed for the purpose of "acquiring, holding, or disposing of securities of [the] issuer" and would not be required to file unless the members conspired to pool their securities interests for one of the stated purposes.[20]
 
 II.
 
 30
 It is not sufficient that we merely conclude that the allegations of the complaint state a violation of section 13(d). We also must determine whether GAF has standing to assert those violations. Here, unlike in our prior discussion we write with the aid of substantial precedent.
 
 
 31
 The Milsteins do not contend, with good reason, that there is no private right of action under section 13(d). The teachings of J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), are part of the ABC's of securities law. Nor do the Milsteins challenge the standing of GAF as an issuer.[21]
 
 
 32
 We have already held that an issuer has standing to assert violation of section 14(a), governing proxy contests, Studebaker Corp. v. Gittlin, 360 F.2d 692 (2d Cir. 1966), and of section 14(d) and (e), governing cash tender offers. Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937 (2d Cir. 1969). These sections, enacted at the same time as section 13(d), are the close companions of that section in the regulatory scheme requiring disclosure in the context of struggles for corporate power.
 
 
 33
 There are compelling reasons in addition to preserving symmetry which mandate that GAF has standing. "In determining who has standing to enforce duties created by statute, a court's quest must be for what will best accomplish the purposes of the legislature." Electronic Specialty, supra, at 946. See also J. I. Case Co. v. Borak, supra, at 433 (". . . it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose."). GAF, as the issuer, unquestionably is in the best position to enforce section 13(d). The statute requires a copy of the statement to be sent by registered mail to the issuer (this provision alone might support the issuer's standing), and the issuer, in the course of constantly monitoring transactions in its stock, better than anyone else will know when there has been a failure to file. Cf. Comment, 81 Harv.L.Rev. 501, 502 (1967). Moreover, the issuer has not only the resources, but the self-interest so vital to maintaining an injunctive action. See Electronic Specialty, supra, at 946. To play upon management's self-interest, of course, raises some threat to Congress's express desire not to tip the scales in favor of incumbent management as against the takeover group. But, this danger can be adequately counteracted if the district court carefully scrutinizes self-serving management claims allegedly made in the interest of investor protection. And, as Electronic Specialty, supra at 946, recognized, "in cases where management causes the corporation to bring a suit motivated by its own interests and contrary to the best interests of the true owners, shareholders have their usual remedies for waste."
 
 III.
 
 34
 The more difficult question is whether GAF has standing under section 13(d) to seek an injunction against allegedly false and misleading filings. The Milsteins in their brief argue that "the short answer" is that false filing does not violate the section that requires the filing-i. e., section 13(d)-but rather the penal provision on false filings, section 32(a), or one of the antifraud provisions, for example, section 10(b). This response, deceptively pleasing in its simple, compartmental approach to the Securities Exchange Act, immediately brings to mind the Supreme Court's instruction that the securities acts should not be construed technically and restrictively, but "flexibly to effectuate [their] remedial purposes." S. E. C. v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963). With this teaching in mind, we conclude that the obligation to file truthful statements is implicit in the obligation to file with the issuer, and a fortiori, the issuer has standing under section 13(d) to seek relief in the event of a false filing.[22]
 
 
 35
 The Williams Act was entitled "An Act Providing for full disclosure of corporate equity ownership of securities under the Securities Exchange Act of 1934." In particular, section 13(d) was intended to alert investors to potential changes in corporate control so that they could properly evaluate the company in which they had invested or were investing. Disclosure which is false or misleading subverts this purpose. In some instances, a false filing may be more detrimental to the informed operation of the securities markets than no filing at all. We also find support for our conclusion in section 13(d) (2) which places a continuing obligation on the person filing to amend his statements "[i]f any material change occurs in the facts set forth." Indeed, it is an argument not without force to urge that false statements immediately place those required to file in violation of Rule 13d-2 which requires "prompt" amendment.[23]
 
 
 36
 It is no answer to the query whether the issuer has standing to seek injunctive relief to respond that the Commission can proceed under penal provisions. The issuer is the only party which can promptly and effectively police Schedule 13D filings, for it is fair to assume that it scrutinizes carefully changes in its stock ownership-particularly of the sort which can initiate control. And in Borak, the Court instructed that "[p]rivate enforcement of the proxy rules provides a necessary supplement to Commission action." 377 U.S. at 432, 84 S.Ct. at 1560. Even if the Commission had the requisite manpower to delve into the details of each Schedule 13D filing, it does not have the issuer's day-to-day familiarity with the facts which would enable it to appraise accurately the statements in the Schedule. An already overburdened Commission staff, taxed with reviewing increased filings under the securities acts, should welcome "a necessary supplement" to its action.
 
 
 37
 Nor is it realistic to expect shareholders to deter persons from filing inaccurate statements by resort to the antifraud provisions. Stockholders are generally unaware of the necessary background information to judge the truth or falsity of the statements. Additionally, since the Act does not require the statements to be disseminated to shareholders, they do not have the immediate access of the issuer to the filings. Moreover, there may be instances where no shareholder has purchased or sold shares "in reliance" on the statements. In that event, even if the shareholders had standing, cf. Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540 (2d Cir. 1967) (non-selling shareholder given standing to seek injunctive relief), there would be little incentive to maintain an action.
 
 IV.
 
 38
 Finally, we deal with Judge Pollack's dismissal of GAF's second claim, which asserted violations of section 10(b) and Rule 10b-5, on the ground that an issuer has no standing. Section 10(b) prohibits, inter alia, the use of any manipulative or deceptive device "in connection with the purchase or sale, of any security." Although the rule of Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952) (only a purchaser or seller of a security can maintain an action under the section), may be subject to exception, see, e. g., Mutual Shares Corp. v. Genesco, Inc., supra, this Court has steadfastly refused to extend the reach of 10b-5 to give standing to an issuer.[24] See, e. g., General Time Corp. v. Talley Industries, Inc., 403 F.2d 159, 164-165 (2d Cir. 1968), cert. denied, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969).
 
 
 39
 Moreover, in this context as opposed to standing under section 13(d),[25] the implications of the enactment of section 14(e) making it illegal to make false or misleading statements "in connection with any tender offer," as distinguished from the "purchase or sale of any security," are somewhat clearer. We recognized in Iroquois Industries, Inc. v. Syracuse China Corporation, 417 F.2d 963, 969 (2d Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970), "[t]hat Congress enacted the new Section . . . is at least an indication that in tender offer contests such as that at bar there was no standing to sue under Rule 10b-5 by either the tender offeror or by the target corporation." This same reasoning is just as meaningful in the framework of section 13(d), and accordingly, we are chary of finding that GAF, based on the allegations before us, has standing under Rule 10b-5.
 
 
 40
 Since we have found that GAF has standing under section 13(d) to seek its remedy based on the alleged fraudulent statements in the Schedules,[26] we see no compelling reason to open the door to issuers to bring the broad range of fraud actions, in some instances seeking more than "injunction" relief, which are cognizable under section 10(b). See Bankers Life and Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). We agree, however, with Judge Friendly's comment in General Time that "we would not wish to place our approval on a holding that under no circumstances can an issuer have standing to seek an injunction."[27] 403 F.2d at 164.
 
 
 41
 In reversing that part of Judge Pollack's order which dismissed Claim I of GAF's complaint on the ground that it failed to state a claim on which relief could be granted, we emphasize that we are not yet called upon to determine whether the Milsteins have in fact violated section 13(d), or, if they have, what relief would be appropriate. That part of Judge Pollack's order dismissing Claim II of the complaint under section 10(b) is affirmed. Costs to the appellant.
 
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 15 U.S.C. Sec. 78m(d)
 
 
 [2]
 We are aware of only four other cases which considered the section. Bath Industries, Inc. v. Blot, 305 F.Supp. 526 (E.D.Wis.1969), aff'd, 427 F.2d 97 (7th Cir. 1970); Ozark Airlines, Inc. v. Cox, 326 F.Supp. 1113 (E.D.Mo.1971); Sisak v. Wings and Wheels Express, Inc., CCH Fed.Sec.L.Rep. p 92,991 (S.D.N.Y. Sept. 9, 1970); Grow Chemical Corp. v. Uran, 316 F.Supp. 891 (S.D.N.Y.1970). See generally Comment, Section 13(d) and Disclosure of Corporate Equity Ownership, 119 U.Pa.L.Rev. 853 (1971)
 
 
 [3]
 Act of July 29, 1968, Pub.L. No. 90-439, 82 Stat. 454, amending Securities Exchange Act Secs. 12-14, 15 U.S.C. Secs. 78l-n
 
 
 [4]
 As of December 22, 1970, section 13(d) (1) was amended to require filing after the acquisition of 5%. Act of December 22, 1970, Pub.L. No. 91-567, Sec. 1, 84 Stat. 1497, amending Securities Exchange Act Sec. 13(d) (1), 15 U.S.C. Sec. 78m(d) (1)
 
 
 [5]
 Section 13(d) (1) empowers the Commission to require disclosure of information "necessary or appropriate in the public interest or for the protection of investors," and specifically requires: (A) the background and identity of the persons filing, (B) the source and amount of funds for any purchases, (C) any plans the persons have with respect to the issuer if their purpose is to acquire control, (D) the number of shares owned and (E) information concerning any contracts, arrangements or understandings with any person with respect to any securities of the issuer. In accordance with this mandate, the Commission pursuant to Rule 13d-1, has prescribed Schedule 13D, 17 C.F.R. Sec. 240.13d-101, for those required to file
 
 
 [6]
 Although a Rule 12(b) (6) motion is addressed solely to the face of the complaint, and our determination on this appeal is based on whether a claim was stated on its face, both parties have discussed the facts extensively in their respective briefs. We make reference to those facts for the purpose of setting forth the background of the dispute
 
 
 [7]
 The 324,166 shares exclude 28,808 trust shares as to which the Milsteins disclaim beneficial ownership
 
 
 [8]
 Although the complaint does not allege a specific date for the initiation of the conspiracy, we accept Judge Pollack's construction that "[p]laintiff alleges that defendants, acting in conspiracy, determined to take over GAF sometime after July 29, 1968, . . ." 324 F.Supp. at 1064. The Milsteins have not challenged this determination
 
 
 [9]
 In fact, GAF commenced an antitrust action against Circle Floor. GAF v. Circle Floor Co. Inc., 329 F.Supp. 823 (S.D.N.Y.). This action has been dismissed
 
 
 [10]
 The Milsteins unsuccessfully brought an action on March 15 to enjoin Jesse Werner, Chairman of the Board and President of GAF, and others from soliciting or voting proxies. Their motion for a preliminary injunction was denied, CCH Fed.Sec.L.Rep. p 92,986 (S.D.N.Y.April 3, 1971), and they did not appeal
 
 
 [11]
 The Milsteins contend that this appeal should be dismissed as moot. The linchpin of their argument is that the GAF management was victorious in the 1971 proxy contest and thus, citing Justice Gray's 1895 rationale for treating appeals as moot, the district court cannot "grant [GAF] any effectual relief whatever." Mills v. Green, 159 U.S. 651, 653, 16 S.Ct. 132, 40 L.Ed. 293 (1895). The Milsteins also rely on a recent brief per curiam decision of this court where we held, in an action charging a violation of section 14(d) (1) and the Clayton Act, that "more than an abstract or nebulous plan to possibly commit a wrong sometime in the future, must be shown before the broad and potentially drastic injunctive power of the court will be exercised." General Fireproofing Co. v. Wyman, 444 F.2d 391, 393 (2d Cir. 1971). In Wyman, we were concerned with a possible future violation of the securities acts that was "pure speculation." The complaint here alleges that past violations of section 13(d) are continuing and that the conspiracy to take over GAF "continues unabated." In the light of these allegations we cannot say that the litigation has become mooted or that the cause for complaint has abated. We are compelled to reiterate that we are not adjudicating facts, nor was the lower court called upon to do so. Moreover, the time is not at hand to consider what injunctive relief, if any, will be necessary to effectuate the policies of the Act in the event GAF should be successful on the merits
 
 
 [12]
 The Milsteins concede that their group would have been required to file if the individual members had acquired additional preferred shares after the effective date of the Williams Act and within a 12-month period which amounted to more than 2% of the outstanding shares
 
 
 [13]
 The convertible preferred stock votes share-for-share with the common stock. Each share of preferred is covertible into 1.25 shares of common stock
 
 
 [14]
 The meaning of "acquiring" hardly could be considered plain when two district court judges recently failed to agree on whether an inheritance of stock was an "acquisition." Compare Sisak v. Wings and Wheels Express, Inc., CCH Fed.Sec.L.Rep. p 92,991 (S.D.N.Y.Sept. 9, 1970), with Ozark Airlines, Inc. v. Cox, 326 F.Supp. 1113 (E.D.Mo.1971)
 
 
 [15]
 Appellees in their brief "concede" that the 1968 committee reports are "against" them. Professor Loss, co-counsel for the Milsteins both in this and the lower court, informed us at the argument that the view set forth in his treatise was "a mistake" and that this passage is "diametrically opposed to the text of the statute" and the purpose and intent of the Williams Act
 
 
 [16]
 The committe reports make it clear that the Act was designed for the benefit of investors and not to tip the balance of regulation either in favor of management or in favor of the person seeking corporate control. See S.Rep.No.550 at 3-4; H.R.Rep.No.1711 at 4
 
 
 [17]
 The appellees correctly argue that section 13(d) was not intended to be retroactive-that is, all persons who held 10% of an outstanding class before July 29, 1968, are not required to file unless they acquire an additional 2% after that date. Compare Sec. 16(a). But, the Milstein group is not a "person" who held its stock before the effective date of the Williams Act, if the allegations of the complaint are to be accepted. The crucial event under section 13(d) was the formation of the group, which allegedly occurred after the effective date and the purpose of which was to seize control of GAF
 
 
 [18]
 Section 13(d) (3) refers to groups formed "for the purpose of acquiring, holding, or disposing of securities." Bath Industries would read out "holding" and "disposing."
 
 
 [19]
 Several commentators have lauded tender offers as a healthy process for unseating inefficient, entrenched management; they warned against giving management another sword which would stifle all takeovers. See, e. g., Brudney, A Note on Chilling Tender Offers, 21 Rutgers L.Rev. 309 (1967); Fleischer and Mundheim, Corporate Acquisition by Tender Offer, 115 U.Pa.L.Rev. 317, 321-22, 360-70 (1967). Congress was fully apprised of these views during the hearings on the Williams bill. See, e. g., Senate Hearings on S. 510, before the Subcomm. on Securities of the Senate Comm. on Banking & Currency, 90th Cong., 1st Sess., at 136-39 (Statement of Prof. Robert Mundheim). Any judicial impetus to cut back on the seeming thrust of the statute must be scrutinized in light of the recent amendment which broadened the impact of section 13(d) by reducing the threshold triggering of the statute from 10% holdings to 5%. See note 4 supra. Although we are well aware that it was Congress's intention primarily to protect investors in the security, the statute cannot be faulted if it achieves this goal without a question, and as a by-product management also becomes aware of those seeking to seize control of the corporation
 
 
 [20]
 The more difficult question, and a question we need not decide on this appeal, is whether management groups which expressly agree to pool their interests to fight a potential takeover are subject to section 13(d). Nor do we intimate any view on whether an insurgent group which has filed under section 13(d) and subsequently is successful in its takeover bid remains subject to the section. In any event, as we have already indicated, the Commission can forestall any untoward effects under the exemptive power conferred upon it by section 13(d) (6) (D)
 
 
 [21]
 Clearly, a shareholder has standing. See Grow Chemical Corp. v. Uran, 316 F.Supp. 891 (S.D.N.Y.1970)
 
 
 [22]
 We have not lost sight of the fact that Congress, when it enacted section 14(d), requiring disclosure by tender offerors, also enacted section 14(e), declaring it illegal to make false or misleading statements in connection with a tender offer, and that section 13(d) has no parallel section. It has been urged that this statutory scheme evidences an intent to bar fraud actions under section 13(d). But, without a clearer indication from Congress, we cannot overlook the fact that a tender offer transaction entails methods clearly distinguishable from section 13(d) dealings. When one makes a tender offer, there is extensive communication to the shareholders. Since section 10(b), which deals with fraud "in connection with the purchase or sale, of any security," does not provide a remedy to shareholders with respect to such communications, see Iroquois Industries, Inc. v. Syracuse China Corporation, 417 F.2d 963 (2d Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561 (1970), there was a clear need for an antifraud provision. A 13(d) transaction, on the other hand, ordinarily does not entail regular communications with the shareholders. We should not be wooden or rigid in granting the right to the issuer seeking equitable or prophylactic relief-not monetary damages-to take the necessary steps to effectuate the purposes of section 13(d). See J. I. Case Co. v. Borak, supra, at 433, 84 S.Ct. 1555; Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540, 546-547 (2d Cir. 1967); cf. Electronic Specialty, supra, 409 F.2d at 946
 Of course, persons subject to section 13(d) may confer or communicate with shareholders in the course of a takeover attempt. If there is a purchase or sale of securities, section 10(b) will apply. If there is a proxy solicitation, section 14(a) will apply.
 
 
 [23]
 GAF informs us that the Milsteins' first Schedule 13D, dated September 24, 1970, was false because it disclaimed any present intention to acquire additional stock, whereas Paul and Seymour Milstein purchased 83,800 shares of GAF common stock within the next two months. The Milsteins, however, did not amend their Schedule 13D until after these purchases were completed. Thus, even assuming that the statement filed on September 24 accurately and truthfully reflected their intentions, clearly those intentions changed when the Milsteins decided to make the additional purchases and before those purchases were actually completed
 
 
 [24]
 In the recent and most authoritative case on section 10(b) and Rule 10b-5, Superintendent of Insurance v. Bankers Life and Casualty Co., 404 U.S. 6, 13 n. 10, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), the Court explicitly refused to express its views on whether an issuer has standing under section 10(b) and Rule 10b-5
 
 
 [25]
 See note 22 supra
 
 
 [26]
 If the district court should find that the Milsteins have violated section 13(d), it will be able to provide full and effective relief under its equity powers. Although stock manipulation (alleged as a violation of section 10(b)) is not per se a violation of section 13(d), GAF has alleged that the manipulation occurred in furtherance of the conspiracy and while the Milsteins were in violation of section 13(d)
 
 
 [27]
 We do not foreclose the possibility, for example, that an issuer might have standing under 10b-5 to seek injunctive relief in circumstances where, despite the absence of a purchase or sale, it has suffered or will suffer direct injury because of the alleged fraud, or where it would be the most appropriate party to assert 10b-5 violations affecting all of its shareholders. The issuer, for example, may have standing to enjoin a manipulative scheme which had the effect of depressing the price of the issuer's stock immediately prior to a contemplated issue of securities, or it may have standing to enjoin a fraud whose purpose was to inflate the market value of the stock of a company with which the issuer was negotiating a merger. Moreover, there may be additional situations in which the standing of the issuer under 10b-5 will have to be appraised anew