SAUNDERS LEASING SYSTEM, INC., Plaintiff,

v.

SOCIETE HOLDING GRAY D'ALBION S.A., Societe De Gestion De Valeurs Mobilieres S.A.R.L., and Gerard Fraikin, Defendants.

Civ. A. No. 79–G–1138–S.

United States District Court, N. D. Alabama, S. D.

Jan. 30, 1981.

Samuel H. Franklin and Hobart, McWhorter, Bradley, Arant, Rose & White, Birmingham, Ala., for plaintiff; Wachtell, Lipton, Rosen & Katz, New York City, of counsel.

L. Vastine Stabler, Jr., Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, Ala., for defendants; Rogers & Wells, New York City, of counsel.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GUIN, District Judge.

This is an action seeking injunctive and other appropriate relief pursuant to alleged violations of Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d), in connection with the defendants' acquisition of the common stock of Saunders Leasing System, Inc. Jurisdiction over this action is further granted by Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa.

A Final Order and Injunction is being entered contemporaneously with the filing of these Findings of Fact and Conclusions of Law.

The court, after hearing the evidence at trial and considering the briefs of counsel, enters the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. Plaintiff Saunders Leasing System, Inc. ("Saunders Leasing") is a Delaware corporation with its principal place of business (and corporate headquarters) in Birmingham, Alabama. Saunders Leasing is primarily engaged in the business of long-term, full-service maintenance leasing of trucks, tractors and trailers, and is the third largest full-service truck leasing company in the United States. The common stock of Saunders Leasing is listed and traded on the American Stock Exchange (the "AMEX"), and is registered for such purposes under Section 12 of the Securities Exchange Act of 1934. As of June 30, 1980, Saunders Leasing had 2,971,348 shares of its common stock issued and outstanding.

2. Members of the Saunders family own approximately 56 percent of the outstanding common stock of Saunders Leasing. To June 30, 1980, no member of the Saunders family owned individually more than 16.2 percent of the company's stock. Harris Saunders, Jr., Chairman of the Board, owned 16.2 percent; when his holdings are combined with those of his wife and of trusts for which he or his wife is trustee, the total equals 21.6 percent. John Robert ("Bob") Saunders, President, owned 14.5 percent; when holdings of his wife and of trusts for which he is trustee are added, the total equals 15.6 percent. Harris Saunders, founder of the company and Chairman of the Executive Committee, owned 4.7 percent; when shares owned by his wife individually and as custodian for other persons are added, the total equals 5.2 percent.

3. Prior to the time that Saunders Leasing went public in about 1968, it was a corporation owned entirely by members of the Saunders family.

4. Defendant Gerard Fraikin ("Fraikin") is 64 years old and is a resident and citizen of France.

5. Societe Holding Gray D'Albion S.A. ("SOHGA") is the only defendant which directly owns any stock of Saunders Leasing. Defendant Societe de Gestion de Valeurs Mobilieres S.A.R.L. ("SOGEVAM") owns 61.04 percent of SOHGA's outstanding stock, and Fraikin, Mrs. Fraikin and their five children own another 14.3 percent of the shares of SOHGA. Defendant SOGEVAM is a holding company that is owned entirely by Fraikin and members of his immediate family. Fraikin is the statutory manager of SOGEVAM. Fraikin's immediate family owns directly and through SOGEVAM an aggregate of 75.34 percent of the stock of SOHGA. SOHGA's directors are elected by a majority vote of its stockholders.

6. Fraikin is the President-Directeur General of SOHGA. In addition to Fraikin, SOHGA's board of directors consists of Mrs. Gerard Fraikin, Jean Bernard Fraikin and Fraikin's cousins, Jean-Pierre Proal and Jean Louis Michel. SOHGA has only one officer, Fraikin. SOHGA's business is to buy shares of other companies and to make investments, and it has no operating business of its own. Fraikin determines the operating policy of SOHGA between meetings of its board of directors. SOHGA's board must meet at least twice annually, and Fraikin determines when additional board meetings should be held. SOHGA's sources of income include: (a) dividends from securities it owns; (b) gains from sales of securities it owns; and (c) commissions charged on guarantees of obligations of its subsidiaries and interest on loans to its subsidiaries.

7. Fraikin has been actively involved in the ownership and management of vehicle leasing businesses in France for many years. He is currently Chairman of the Board and President-Directeur General of Fraikin S.A., one of the largest truck leasing companies in France.

8. SOHGA and members of the Fraikin family own in excess of 90 percent of the stock of General Trucklease, Inc. ("General Trucklease"), which is in the business of leasing vehicles. General Trucklease's principal executive offices are in Atlanta, Georgia. Fraikin is Chairman of the Board of Directors of General Trucklease.

9. Pierre Cabon is a financial advisor to Fraikin and SOHGA and is compensated for his services as such.

10. Lehman Brothers, Kuhn Loeb, Inc. ("Lehman Brothers") is an investment banking firm whose principal office is in New York, New York. Lehman Brothers provided services to SOHGA in connection with the purchase of shares of General Trucklease.

11. Fahnestock and Co. ("Fahnestock") is an independent company engaged in business as a stockbroker, and is the company through which SOHGA has purchased its shares of Saunders Leasing. Mr. C. Cellier is the person in charge of the Paris office of Fahnestock and the person with whom Fraikin has principally dealt concerning SOHGA's purchases of Saunders Leasing stock. In connection with those purchases, Fahnestock performed no function for SOHGA other than informing Fraikin of the number and prices of Saunders Leasing shares available for purchase, and, pursuant to instructions from Fraikin, effectuating purchases SOHGA desired to make.

12. In early 1977, Fraikin proposed to use the services of Claude Gros ("Gros") to look for an investment in the United States in the truck leasing business for SOHGA. In April 1977, Gros wrote a letter to Fraikin stating that Saunders Leasing was almost uniquely the best candidate for Fraikin if his purpose was to acquire actual control of an American company. In June 1977 Gros prepared a written proposal to Fraikin suggesting the possibility of subscribing to a proposed new issue of convertible bonds of Saunders Leasing. His proposal outlined advantages for both the Saunders and Fraikin families, including the fact that with approximately 25 percent of the capital, the Fraikin family would be an important shareholder likely to profit later from the fact that the Saunders shares would be divided up among several people. The proposal to issue convertible bonds was never consummated and no bonds were issued or subscribed.

13. During a family vacation in July 1977, Harris Saunders, Jr., after Gros contacted Fraikin in June regarding the possibility of Fraikin making a direct investment in Saunders Leasing, met with Fraikin and Gros at Fraikin's home in the south of France. At this time Fraikin told Saunders that he was interested in making a direct investment in Saunders Leasing.

14. In September 1977, negotiations took place in New York City between representatives of Saunders Leasing and representatives of SOHGA, including Cabon. The negotiations were unsuccessful and SOHGA thereafter determined to look into the possibility of investing in other American companies.

15. In February 1978, SOHGA and the Fraikin family purchased shares of General Trucklease.

16. In October 1978, Mr. and Mrs. Fraikin made a social visit to Birmingham during which they were shown Saunders Leasing's headquarters and its facilities. During this visit, there was no discussion concerning the purchase of Saunders Leasing stock by SOHGA. As a result of this visit, Fraikin became more convinced that SOHGA should have a significant participation in Saunders Leasing stock.

17. In November 1978, Fraikin instructed Fahnestock to buy progressively up to ten percent of the outstanding Saunders Leasing shares, but to do so gradually so as not to raise the market price of the stock abnormally.

18. On November 20, 1978, SOHGA began purchasing Saunders Leasing shares on the AMEX.

19. By February 16, 1979, SOHGA had acquired five percent of the outstanding shares, and ten days thereafter it filed a Schedule 13D with the Securities and Exchange Commission (the "SEC"). The Schedule 13D stated that the "exclusive" purpose of SOHGA's purchases was "investment" and that SOHGA planned to increase its "investment" if and when market conditions made "such investment appear attractive." A copy of the Schedule 13D was mailed to Saunders Leasing's corporate headquarters in Birmingham, Alabama, as were copies of subsequent amendments to the Schedule 13D.

20. A meeting was held in Atlanta on April 1, 1979, between Saunders Leasing representatives and Fraikin to discuss SOHGA's interest in Saunders Leasing. At that meeting, Fraikin acknowledged that he could not serve on the Saunders Leasing board or be privy to "inside information" concerning Saunders Leasing so long as he continued to serve on the board of General Trucklease, Inc.

21. In May 1979, Bob Saunders visited Fraikin in Paris. At this time, Fraikin told Bob Saunders that he intended to acquire 25 percent of the outstanding Saunders Leasing common stock through open-market purchases unless Saunders Leasing made a proposal for a direct investment that Fraikin considered more attractive.

22. Harris Saunders, Jr., visited Fraikin in Paris during the last week of July 1979. The possible agreements that were discussed at that time by Harris Saunders, Jr., with Fraikin and Cabon involved the possible acquisition by SOHGA of a 25 percent interest in Saunders Leasing. This conversation is confirmed by a memorandum dated August 1, 1979, by Cabon, recording his conversation with Harris Saunders, Jr., concerning SOHGA's obvious ability to achieve its 25 percent ownership purpose by buying the stock on the open market.

23. On September 24, 1979, representatives of Saunders Leasing met with Fraikin and other representatives of SOHGA in New York, at which time a proposal was discussed to have Saunders Leasing issue additional shares of Saunders Leasing stock and sell them privately to SOHGA, to allow SOHGA to achieve a 25 percent interest in Saunders Leasing stock. The price of any direct purchases suggested by Saunders was much higher than the price at which Fraikin could purchase the stock on the open market.

24. Following the breakdown of these negotiations, this litigation was commenced. At the time this litigation began, SOHGA owned approximately 12.9 percent of the stock of Saunders Leasing. In the 11 months since the litigation was commenced, and before the date of trial, SOHGA acquired an additional four percent.

25. Saunders Leasing does not have cumulative voting.

26. Saunders Leasing has no way of knowing or proving exactly how many round-lot shareholders each street name broker represents and thus has no way of knowing the exact number of shareholders of Saunders Leasing. With over 16 percent of the stock in the hands of SOHGA, there are still 1,163 Saunders shareholders of record, and the actual number of shareholders exceeds that number by at least 39. To be threatened with delisting, the number of round-lot shareholders would have to be reduced below 400.

27. The plaintiff's expert witness admitted that the market in Saunders Leasing stock is presently a very liquid one.

28. On October 16, 1979, members of the Saunders family owning more than 50 percent of the stock of Saunders Leasing filed a Schedule 13D in which they stated that they might be deemed a group. Item 4 of the 13D Schedule stated as follows:

In addition, the Filing Stockholders believe that continued purchases of Shares by SOHGA may be detrimental to the market for the Company's securities (including the Shares) in that the reduction in the publicly traded float of Shares may, among other things, result in the delisting of the Shares from AMEX. Any reduction in the float reduces, and any such delisting would more significantly reduce, the liquidity of the Shares and could impede any future equity financing by the Company, all of which would have an adverse effect on the attractiveness of the Company's securities.

29. On March 17, 1980, the Saunders Leasing management notified stockholders of the existence of this litigation in its Proxy Statement, stating:

The amended Complaint alleges, among other things, that management of SOHGA has indicated an intention of acquiring approximately 25% of the outstanding shares of Saunders, and that if this course of action is successful, the

Company's shares might be subject to being delisted from active trading by the American Stock Exchange as the result of a possible reduction in the number and geographic distribution of public shares.

30. If the "high" is used, common stock in Saunders Leasing has doubled in price in the last four years. It has, however, sold for many years below book value. It appears from all indicia to be a safe investment, one with good potential for consistent growth over both the medium and long term, with the element of the possibility of the Saunders family group breaking up at some time during the next few years, either because of the death of a key executive such as Harris Saunders, Jr., or Bob Saunders, or because of the death of Harris Saunders, Sr., or any of several reasons which might lead to a change in investment objectives of members of that group. These future prospects are admittedly speculative, but certainly possible.

31. The court does not find that Mr. Fraikin has or has had a plan or scheme to take control of the company. He has simply been buying stock on the open market, through a broker who has been instructed to be prudent and to make his purchases slowly and without any distortion of the market.

32. The disclosures made by Saunders in its 13D and, more importantly, the proxy statement of March 17, 1980, which went to all shareholders of record, contain all of the facts which the plaintiff requests that the defendants disclose; however, these disclosures have not significantly affected the market price of the stock, which has held around $9.00.[1] One third of the purchases have been made since that proxy statement, and the disclosures therein have not distorted the market or precipitated any lawsuits.

## CONCLUSIONS OF LAW

### 1. *Standing*

The purpose of Section 13(d) is to require disclosure of information by persons who have acquired a substantial interest or increased their interest in equity securities of a company by a substantial amount, within a relatively short period of time. S.Rep. No.550 at 7; H.R.Rep.No.1711 at 8, U.S. Code Cong. and Administrative News 1968, pp. 2811, 2818. The decision reached in the case of *GAF Corporation v. Milstein*, 453 F.2d 709 (2d Cir. 1971), has been regarded as the landmark authority on the question of a target company's standing to maintain an action under Section 13(d). In that case, the court concluded that:

> [T]he obligation to file *truthful* statements is implicit in the obligation to file with the issuer, and, *a fortiori*, the issuer has standing under Section 13(d) to seek relief in the event of a false filing.

453 F.2d at 720. The Second Circuit has reaffirmed its holding in *Milstein* in its recent decision in *Treadway Companies, Inc. v. Care Corp.* [Current], 638 F.2d 357 Fed.Sec.L.Rep. (CCH) ¶ 97,603 at 98,209 (2d Cir. 1980).

The First Circuit in *General Aircraft Corp. v. Lampert*, 556 F.2d 90 (1st Cir. 1977), held that when there is a finding that a 13D Schedule is incomplete, inaccurate or false, the corporation has a right to injunctive relief "until the Schedule 13D is amended to reflect accurately their [the officers'] intentions." *Id.* at 97.

The Eighth Circuit upheld the target corporation's standing to maintain an equitable action involving the completeness and truthfulness of a Section 13(d) filing in *Chromalloy American Corp. v. Sun Chemical Corp.*, 611 F.2d 240 (8th Cir. 1979). In *Chromalloy*, the circuit court sustained the target corporation's right to secure equitable relief requiring the purchaser to file an accurate, truthful, and complete Schedule 13D in order to make a "full and fair disclosure." *Id.* at 248, n. 16.

Finally, the Fourth Circuit in the recent opinion in *Dan River, Inc. v. Unitex Limit-*

---

1. This is true even until December 19, 1980, as disclosed by amended Schedule 13D's filed by SOHGA, as provided by the plaintiff. Although not introduced into evidence at trial, the court feels that it can rely on this information because it has been provided by the plaintiff and is being used against the plaintiff.

*ed*, 624 F.2d 1216 (4th Cir. 1980), concluded, following the reasoning of the cases cited infra, that the target corporation, Dan River,

> has a right to seek equitable relief enjoining the defendants and should Dan River establish that there is a reasonable basis for concluding that the Schedule 13D filed by the defendants is inaccurate, incomplete, or misleading in its statement of any of the matters expressly demanded by section 13(d), the district court may and should grant appropriate injunctive relief and should require the filing of an amended Schedule 13D complying with the requirement of a truthful and complete statement as contemplated under the statute.

624 F.2d at 1224. It should be noted and emphasized, for purposes of distinction with other cases, that the court in *Dan River* specifically limited this right of the corporation to (1) enforcing the filing of a complete and accurate Schedule 13D, and (2) equitable relief. *Id.*

 The Fifth Circuit Court of Appeals has not yet ruled on this issue of standing under Section 13(d) of the 1934 Securities and Exchange Act; however, under the persuasive authority of the other circuit court cases cited herein and the purpose behind Section 13(d), it is clear that Saunders has standing to challenge violations of Section 13(d).

### 2. Jurisdiction

Under the reasoning expressed in the cases on standing, upon a finding that a purchaser's Schedule 13D is inaccurate, incomplete or misleading, a federal district court has the power to require the filing of an amended Schedule 13D complying with the requirement of a truthful and complete statement as contemplated under Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d); *Dan River, Inc. v. Unitex Limited*, 624 F.2d 1216 (4th Cir. 1980). Jurisdiction over this action is further granted by Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa.

### 3. Disclosures Sought in an Amended Schedule 13D

#### A. 25 percent ownership

The plaintiff alleges that the defendant failed to make certain disclosures as allegedly required by Item 4 of Schedule 13D. Such disclosures include: the defendants' intention to acquire at least 25 percent of the outstanding shares of Saunders Leasing common stock; the defendants' failure to disclose their determination to acquire an influential position in, and to seek to direct the business and management of, Saunders Leasing; the effect of the defendants' stock purchases on the market for Saunders Leasing's stock; the defendants' ability to distort, control and manipulate the trading market in Saunders Leasing stock; Fraikin's and SOGEVAM's power to dispose of, or vote SOHGA's Saunders Leasing shares; contracts, arrangements, understandings or relationships the defendants may seek with, and other plans they may have concerning Saunders Leasing; the defendants' identities and backgrounds; and the defendants' contracts and arrangements with Lehman Brothers concerning Saunders Leasing.

Item 4 of Schedule 13D, as amended by the Securities and Exchange Commission effective May 30, 1978, provides in relevant part:

> *Purpose of Transactions.* State the purpose or purposes of the acquisition of securities of the issuer. Describe any plans or proposals which the reporting persons may have which relate to or would result in:
>
> (a) The acquisition by any person of additional securities of the issuer, or the disposition of securities of the issuer;
>
> . . . . .
>
> (d) Any change in the present board of directors or management of the issuer;
>
> . . .
>
> (e) Any material change in the present capitalization or dividend policy of the issuer;
>
> (f) Any other material change in the issuer's business or corporate structure . . . ;
>
> . . . . .

(h) Causing a class of securities of the issuer to be delisted from a national securities exchange ...;

. . . . .

(j) Any action similar to any of those enumerated above.

In this revised version of Item 4, the term "control" is not used. Under the former terms of Item 4, if one *purpose* of the securities purchaser's purchase was to acquire control, it would have to be disclosed. Under the present version, a securities purchaser is required to disclose the purpose of the purchase and, in addition, to disclose certain plans or proposals, as enumerated in (a) through (j), regardless of whether the underlying purpose is to acquire control of the issuer. It has been held, further, that this revised Item 4 of Schedule 13D requires disclosure of a purpose to acquire control, even though this intention has not taken shape as a fixed plan. *Chromalloy American Corp. v. Sun Chemical Corp.*, 611 F.2d 240, 247 (8th Cir. 1979).

"Control" is defined in Rule 12b–2(f), 17 C.F.R. § 240.12b–2(f) (1979), which is made applicable to Schedule 13D filings by 17 C.F.R. § 240.12b–1 (1979). Rule 12b–2(f) provides:

> *Control.* The term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

17 C.F.R. § 240.12b–2(f) (1979).

█ This court holds that the defendants had the purpose of obtaining 25 percent of the common stock of Saunders Leasing when SOHGA began to acquire Saunders Leasing stock. This purpose of acquisition should have been disclosed in the Schedule 13D as a 25 percent ownership amounts to control within the definition in Rule 12b–2(f). *Chromalloy American Corp. v. Sun Chemical Corp.*, 611 F.2d 240 (8th Cir. 1979). In *Dan River, Inc. v. Unitex Limited*, 624 F.2d 1216, 1225 (4th Cir. 1980), it was ac-

knowledged that an accumulation of 20 percent of the stock in a publicly held corporation frequently is regarded as control of that corporation. It is clear that any owner of 25 percent of the common stock of a company will have to be dealt with. For example, a 25 percent block of stock could prevent certain tax treatment during a merger or consolidation under the Internal Revenue Code. *See* Section 332 of the Internal Revenue Code (1954), as amended. Thus, such a block of ownership amounts to "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies ...." 17 C.F.R. § 240.12b–2(f) (1979).

However, the court does not find that Mr. Fraikin or the other defendants have or have had a plan or proposal to take control of the company, unless prudent purchases can be so denominated. SOHGA has simply been buying the stock on the open market, through a broker who has been instructed to be prudent and to make his purchases slowly and without any distortion of the market. However, as stated previously, "Item 4 specifically requires disclosure of a purpose to acquire control, regardless of the definiteness or even the existence of any plans to implement this purpose." *Chromalloy*, 611 F.2d 240, 247 (8th Cir. 1979).

Thus this court holds that the defendants had a purpose in acquiring the Saunders Leasing stock of obtaining a 25 percent interest, which must be disclosed as a control purpose. However, the defendants did not have any plan or proposal that must be disclosed on the Schedule 13D.

### B. *Board membership*

With respect to plaintiff's claim that SOHGA intends, through open market purchases, to place two of its representatives on the Saunders Leasing board, a fact that must be disclosed under (d) of Item 4, it should be noted that Saunders Leasing does not have cumulative voting; hence, a 25 percent interest could not elect anyone to the Saunders Leasing board. Additionally, Mr. and Mrs. Fraikin are disqualified by

reason of SOHGA's ownership of General Trucklease, Inc., which creates a conflict of interest. Any attempts by Fraikin to get one or two board of directors seats were connected with direct purchase negotiations, in which Fraikin was asked to pay a large premium for the stock.

### C. Delisting and the float

■ Plaintiff claims that defendants should disclose the possible delisting of Saunders Leasing stock from the American Stock Exchange due to the reduction in the float if SOHGA obtains its 25 percent acquisition of stock, as required under (h) of Item 4 of Schedule 13D. However, as stated in the facts, the court finds that the possibility of delisting due to the reduced float is highly speculative and, hence, need not be disclosed. Parties are not required to disclose plans which are contingent or indefinite. *Missouri Portland Cement Co. v. H. K. Porter Co.*, 535 F.2d 388, 398 (8th Cir. 1976).

■ Other possible adverse consequences are also speculative. To date, Saunders stock has remained relatively stable, despite the disclosures made in the proxy statement by Saunders Leasing in March 1980 to all shareholders. In addition, the plaintiff's own expert witness, Martin Siegal, stated during the trial that the market in Saunders stock is a very liquid one right now. Matters not set out in S.E.C. rules and regulations need not be disclosed in 13D statements. *See Chromalloy American Corp. v. Sun Chemical Corp.*, 483 F.Supp. 116, 119 (E.D.Mo.1980).

All other information requested by the plaintiff to be disclosed in the Schedule 13D appears to be similarly speculative.

### 4. Remedy

The plaintiff in this case requests this court to issue:

(1) a permanent injunction requiring the defendants to file, and to transmit to every stockholder of record, an accurate and complete Schedule 13D and to cease further purchases of any Saunders Leasing security until the disclosures in the corrected Schedule 13D are disseminated to the investing public;

(2) an order requiring the defendants to offer rescission to all persons from whom they acquired Saunders Leasing securities in violation of Section 13D;

(3) an order requiring the defendants to divest themselves of any remaining Saunders Leasing securities purchased in violation of Section 13(d); and

(4) an order awarding plaintiff costs, disbursements and reasonable attorneys' fees.

■ An injunction for a violation of Section 13(d) will issue if the plaintiff establishes that irreparable harm is caused by the violation. *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). Accordingly, courts have held that the filing of an incomplete or inaccurate Schedule 13D constitutes irreparable harm that necessitates the issuance of an injunction requiring defendants to file a complete and accurate Schedule 13D. *See Dan River, Inc. v. Unitex Limited*, 624 F.2d 1216 (4th Cir. 1980); *General Aircraft Corp. v. Lampert*, 556 F.2d 90 (1st Cir. 1977); *Kirsch Co. v. Bliss & Laughlin Industries, Inc.* [Current] Fed.Sec.L.Rep. (CCH) ¶ 97,580 at 98,069 (W.D.Mich., July 1, 1980).

In addition, courts have enjoined violators from making additional purchases of stock not only until they file a corrected Schedule 13D, but also until the investing public has had a chance to digest the amended filing. *General Aircraft Corp. v. Lampert*, infra; *Lane Bryant, Inc. v. Hatleigh Corp.* [Current] Fed.Sec.L.Rep. (CCH) ¶ 97,529, at 97,768 (S.D.N.Y., June 9, 1980).

■ This court does find that the defendants have violated Section 13(d) by failing to disclose their purpose of obtaining 25 percent of Saunders Leasing Company. The investing public has a right to know this information; however, this information was disclosed by the plaintiffs in their proxy sent to all shareholders of record on March 17, 1980, which did not affect the market price of Saunders Leasing stock. Yet, only the defendants can clarify the

confusion they have created by failing to file an accurate 13D statement themselves.

It is well established that when a federal district court is asked to determine the appropriate remedy for a violation of the Securities Exchange Act, it sits as a court of equity. *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972). Accordingly, this court orders that SOHGA file a 13D stating that, subject to the approval of the French government, which is required if SOHGA acquires more than 20 percent of the common stock in Saunders Leasing, it plans to acquire 25 percent of the common stock of Saunders Leasing System, Inc., if and when the market price is attractive as an investment. Furthermore, SOHGA is enjoined from making any more purchases of Saunders Leasing System, Inc., stock until this amended Schedule 13D is filed.

After SOHGA has complied with the requirements of Section 13(d), the court does not perceive of such ongoing harm to Saunders Leasing or its present shareholders as would justify a cooling-off period or a stockholder mailing. Those investors who were previously misinformed by the Schedule 13D and amendments will have been correctly informed by the same form of communication. Those shareholders who may have sold to SOHGA without attempting to excise a control premium have an adequate remedy at law. *Rondeau v. Mosinee Paper Corp.*, infra; *Missouri Portland Cement Co. v. H. K. Porter Co.*, 535 F.2d 388 (8th Cir. 1976).

To support the sweeping relief requested here, plaintiff relies principally upon orders in cases involving *tender offers* and in cases arising under Section 10(b) of the Securities Exchange Act; no such claims are involved in this case.

On the issue of rescission and divestiture, the recent Second Circuit case of *Treadway Cos. v. Care Corp.* [Current], 638 F.2d 357, at 379, n. 42, Fed.Sec.L.Rep. (CCH) ¶ 97,603 at 98,209, n. 42 (2d Cir., Aug. 12, 1980), a case whose facts are remarkably similar to the present case, the court noted:

The present case bears no resemblance to cases in which outsiders make an illegal tender offer for the target company's shares. In the latter situation, the illegality lies in the actual acquisition of shares and the remedy of divestiture would be directly responsive to the harm caused thereby.

Finally, the purpose of Section 13(d), as noted in *Treadway* [Current], 638 F.2d at 380, Fed.Sec.L.Rep. (CCH) ¶ 97,603 at 98,209 (2d Cir. 1980), and expressly stated by Congress, should always be kept in mind on the issue of remedies for violations:

The goal of 13(d) is to "alert the market place to every large, rapid aggregation or accumulation of securities ... which might represent a potential shift in corporate control." *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971), *cert. denied* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). But as the Supreme Court noted in *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975), Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts. *See* S.Rep.No. 550, 90th Cong., 1st Sess. 3 (1967); H.R.Rep.No. 1711, 90th Cong., 2nd Sess. 4 (1975).

Fed.Sec.L.Rep. (CCH) ¶ 97,603 at 98,209.

An order consistent with these Findings of Fact and Conclusions of Law is entered contemporaneously herewith.