KIRSCH COMPANY, Plaintiff,

v.

BLISS AND LAUGHLIN INDUSTRIES,
INC., Defendant.

No. K–80–319.

United States District Court,
W. D. Michigan, S. D.

July 1, 1980.

Ronald L. Engel, James M. Amend, Kirkland & Ellis, Chicago, Ill., for plaintiff.

Allan Horwich, Ann R. Heitland, Schiff, Hardin & Waite, Chicago, Ill., for defendant.

## OPINION

ENSLEN, District Judge.

### Procedural and Factual Background

KIRSCH's action against BLISS & LAUGHLIN INDUSTRIES, INC. (BLI) is brought pursuant to § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, to enjoin alleged violations of § 13(d) of that Act, 15 U.S.C. § 78m(d), and the rules and regulations of the Securities and Exchange Commission (SEC) promulgated thereunder, in connection with BLI's purchase of approximately 9.6 percent of the shares of KIRSCH's common stock.

More specifically, KIRSCH alleges that BLI and its officers violated the federal securities laws by misrepresenting, on the Schedule 13D, its actual purpose in purchasing KIRSCH's stock, by stating that the shares were purchased "for the purpose of investment".

In this action, KIRSCH seeks to enjoin preliminarily, Defendant BLI and its officers, directors, agents, employees, and attorneys from: (a) acquiring or attempting to acquire in any manner any shares of KIRSCH's stock; (b) exercising or attempting to exercise, directly or indirectly, any influence or control over the business or management of KIRSCH; (c) voting in person or by proxy any shares of KIRSCH's stock or seeking to obtain any representation on KIRSCH's Board of Directors or otherwise exercising any of the rights or incidents of ownership of KIRSCH's stock;

(d) making any public statement or any statements intended, or reasonably likely, to reach KIRSCH stockholders or the public in connection with any aspect of KIRSCH; its business, management, officers, directors or securities.

Furthermore, Plaintiff KIRSCH asks this Court to declare that, BLI violated § 13(d) of the 1934 Act and rules 13d–1 and 13d–101, in that, BLI failed to disclose its intent to obtain control of KIRSCH; and to order BLI to file an amendment to its Schedule 13D correcting all misrepresentations and omissions contained therein—and stating all facts required or necessary so as not to mislead the public investors. Lastly, Plaintiff KIRSCH asks this Court to order BLI to divest itself of all shares of stock now owned or controlled by BLI.

This action comes before the Court one month after KIRSCH filed its original Complaint on May 13, 1980. During that period of time, extensive discovery has been had by both sides involving many depositions; and scores of documents have been produced by both sides.

On May 19, 1980, this Court issued an Order enjoining further purchases of KIRSCH's stock by BLI and its officers and directors, which Order emanated from counsel for both parties, and was related to their discovery efforts. On May 29, 1980 this Court, upon the agreement of Plaintiff KIRSCH and Defendant BLI, issued a Protective Order stating, in effect, that all transcripts of depositions, affidavits, exhibits, documents or things, copies thereof, other documents filed with the Court, and its contents, be designated "Confidential Matter" and be used only for the purposes of this litigation.

Awaiting a determination from this Court of the motion pending before it, counsel has agreed to preserve the status quo for one week after the conclusion of the hearings.[1]

### Threshold Consideration

Before considering the merits of the issues now before this Court, a threshold question must first be addressed.

Defendant BLI contends that KIRSCH lacks standing because an investee company (KIRSCH) has no standing to sue an investor company (like BLI), either on its own behalf or on behalf of its stockholders, seeking injunctive relief based upon an alleged false Schedule 13D.[2] For this conclusion Defendant relies on *Gateway Industries, Inc. v. Agency Rent-A-Car* (N.D.Ill.1980).

In *Gateway, supra*, the Court relied on two recent Supreme Court decisions, for its holding that a private action does not exist in the 13(d) context.

The Supreme Court has developed more restrictive principles to govern the implication of private rights of action. *Gateway* at p. 6.

In *Touche Ross & Company v. Reddington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), a *damage action* (emphasis supplied) was brought under a regulatory provision in the 1934 Act requiring brokers and dealers to maintain certain records. In this case, the court found no evidence of Congressional intent to create a private right of action under § 17(a) of the Act.

In addition, the court in *Gateway, supra*, relied on *Transamerica Mortgage Advisors,*

---

**1.** By virtue of a Court Order issued on June 23, 1980 the Court's Order of May 19, 1980 was extended until July 3, 1980 at 11:59 p. m.

**2.** On June 19, 1980, one day after the conclusion of the hearing, Attorney Horwich, counsel for BLI, transmitted to this Court a letter and a copy of Judge Aspen's Opinion in *Gateway Industries, Inc. v. Agency Rent-A-Car* No. 80C1845 (N.D.Ill.) asking the Court to take into consideration Judge Aspen's decision, in ruling upon the pending motion.

In this decision, Judge Aspen held that an investee company (like KIRSCH) has no standing to sue an investor company (like BLI) on its own behalf or on behalf of its stockholders for injunctive relief.

On June 20, 1980, the Court received from Attorney Engel, counsel for KIRSCH, a response in opposition to Mr. Horwich's letter and Judge Aspen's Opinion.

Although BLI has not previously raised this issue at the hearing, in its brief, or filed a Motion to Dismiss, the Court feels compelled to address this issue.

*Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). This case involved the interpretation of the legislative history of the Investment Advisers Act of 1940. The court in *Transamerica, supra,* found that § 215 of the Act, 15 U.S.C. § 80b–15 gave rise to a private right of action for equitable relief, but § 206 of the same Act, 15 U.S.C. § 80b–6, did not create such a private damage action. Again, the court looked solely to the intent behind the Act as expressed by the statutory language and legislative history.

This Court is not persuaded by these cases as they apply to a 13(d) action because: (1) the cases involve damages rather than injunctive relief; and (2) there was no public interest requiring full and truthful disclosure.

Thus, *Gateway, supra,* by analyzing the statutory language and legislative history of 13(d) of the Act, in view of the two preceding Supreme Court cases, concluded that:

> . . . plaintiff Gateway may not maintain this action under 13(d) either on its own behalf or for the benefit of its shareholders. At p. 17.

This Court finds such interpretation of 13(d) to be unsupported, and in the absence of controlling decisions to the contrary, rejects it for the following reasons:

> The purpose of § 13(d) is to require disclosure of information by persons who have acquired a substantial interest or increased their interest in equity securities of a company by a substantial amount, within a relatively short period of time. S.Rep.No.550 at 7; H.R.Rep.No. 1711 at 8 U.S.Code Cong. and Administrative News p. 2818.

Without such disclosure, investors will not be able to assess the potential for change in corporate control and adequately evaluate the company's worth.

This Court chooses to rely, instead, on decisional authority which has upheld the existence of a private right of action for injunctive relief under § 13(d).[3] The courts' most recent affirmation of this recognition of a corporation's right of action under § 13(d) can be found in *Dan River, Inc. v. Unitex, Ltd.,* 624 F.2d 1216 (C.A.4 1980).

In *Dan River, supra,* plaintiff brought an injunctive action against *Unitex* for allegedly filing a false and misleading 13D. The District Court dismissed plaintiff's action because, in its opinion, official compliance with the requirements of 13(d) had been made. The Fourth Circuit reversed, holding that a lower court must look beyond a purchaser's self-serving interest in determining whether the purchaser intended to acquire control. Upon discussing the issue of standing raised by the defendant, the court relied on *GAF Corp. v. Milstein,* 453 F.2d 709 (C.A.2 1971) as being the landmark authority on point.

In *GAF, supra,* the court succinctly stated the issue as follows:

> The more difficult question is whether GAF has standing under § 13(d) to seek an injunction against allegedly false and misleading filings. The Milsteins in their brief argue that 'the short answer' is that false filing does not violate the section that requires the filing—i. e., § 13(d)—but rather the penal provision on false filings, § 32(a), or one of the antifraud provisions, for example, § 10(b). (At p. 720).

In resolving the issue, the court in *GAF* concluded:

> With this teaching in mind, we conclude that the obligation to file *truthful* statements is implicit in the obligation to file with the issuer, and, *a fortiori,* the issuer has standing under § 13(d) to seek relief in the event of false filing. (Opinion) At p. 720.[4]

---

**3.** Even the court in *Gateway* acknowledged the unanimity of other circuits in holding this to be true.

**4.** Other cases which hold that standing exists to an issuer seeking injunctive relief in a 13(d)

action include: *Chromalloy American Corporation v. Sun Chemical Corporation,* 611 F.2d 240 at p. 247 (C.A.8 1979); *General Aircraft Corporation v. Lampert,* 556 F.2d 90, at p. 96.

No other decisions, cited to the Court by the Defendant, or discovered by the Court itself, hold that an investee corporation (KIRSCH) may not seek equitable relief under § 13(d).

Any other result would certainly defeat the purpose of 13(d), and the "remedial purposes" behind the Act of 1934. Thus, there is no doubt, that KIRSCH has standing to contest violations of § 13(d).

■ Furthermore, it should be noted, in light of the fact that the Sixth Circuit Court of Appeals has not yet ruled on the question in the instant case, a District Court is not bound by the decisions of the Court of Appeals for another Circuit (*U. S. A. v. Finazzo*, 429 F.Supp. 803 (E.D.Mich. 1977); *Ghandi v. Police Department of Detroit*, 74 F.R.D. 115 (E.D.Mich.1977)), and certainly is not bound by the decision of a District Court in another Circuit.

### The Parties

KIRSCH COMPANY is a Michigan corporation with its principal place of business in Sturgis, Michigan. It is engaged, essentially, in the manufacturing and marketing of drapery hardware, including window treatments, housewares, shelving, etc. KIRSCH has in excess of 2,500,000 shares of common stock outstanding which are listed and traded on the New York Stock Exchange and are held by approximately 3,225 shareholders.[5] The common stock has been traded at prices ranging from $14 to $24 per share during the period discussed herein.

BLISS & LAUGHLIN is a corporation organized under the laws of the State of Delaware, with its headquarters and executive offices located in Oakbrook, Illinois. BLI is a diversified manufacturer of various products, principally cold finish steel bars, construction tools and metal products. BLI is a publicly held corporation, and its securities are listed and traded on the New York Stock Exchange.

### Findings of Fact

The background and governing facts in this complex drama embrace personality conflicts, distrust, animosity, corporation politics, as well as a display of ingenuity and sophistication by brokers, investment bankers, and corporate counsel.

On February 4, 1980, BLI commenced purchasing KIRSCH's stock through open market transactions. Between February 4, 1980 and May 1, 1980, BLI accumulated approximately 5.4 percent of KIRSCH's outstanding stock in some 49 separate transactions. On the latter date, BLI filed a Schedule 13D pursuant to § 13(d)(1)[6] of the Securities Exchange Act of 1934 stating that it had purchased 138,300 shares of the common stock of KIRSCH at prices ranging from $14.75 to $17.25 per share. The Schedule 13D further stated:

Item 4. *Purpose of Transaction.* The shares of the Issuer's Common Stock covered by this Statement were purchased and *are being held for investment.* Bliss & Laughlin intends to continually assess the Issuer's financial position and operations and the market for the purchase and sale of the Issuer's securities. Depending upon such continuing assessment

---

**5.** Based on KIRSCH's 1979 Annual Report.

**6.** This section, 15 U.S.C. § 78m(d)(1) provides in pertinent part that:

Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to § 78L of this Title (15 U.S.C. § 78l) . . . or any equity security issued by a closed-end investment company registered under the Investment Company Act 1940 (15 U.S.C. § 80a–1 et seq.), is directly or indirectly the beneficial owner of more than five per centum of such class shall, within ten days after such acquisition, sent to the issuer of the security at its principal executive office, by registered or certified mail, sent to each exchange where the security is traded and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors—

and future developments, Bliss & Laughlin may determine, from time to time or at any time, to increase its investment in the Issuer's Common Stock, or sell or otherwise dispose of some or all of its holdings. In making any such determination, Bliss & Laughlin will also consider other business opportunities available to it, prospects for its own business, general economic conditions, and money and stock market conditions.

Other than as described above, Bliss & Laughlin *does not* have any present plans or proposals which relate to or would result in: (i) the acquisition by any person of additional securities of the Issuer, or the disposition of securities of the Issuer; (ii) an extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving the Issuer or any of its subsidiaries; (iii) a sale or transfer of a material amount of assets of the Issuer or any of his subsidiaries; (iv) any change in the present Board of Directors or management of the Issuer, including any plans or proposals to change the number or term of directors or fill any existing vacancies on the Board; (v) any material changes in the present capitalization or dividend policy of the Issuer; (vi) any other material change in the Issuer's business or corporate structure; (vii) changes in the Issuer's charter, by-laws, or other instruments corresponding thereto or other actions which may impede the acquisition of control of the Issuer by any person; (viii) causing a class of securities of the Issuer to be delisted from a national securities exchange or to cease to be authorized to be quoted in an inter-dealer quotation system of a registered national securities association; (ix) a class of equity securities of the Issuer becoming eligible for termination of registration pursuant to Section 12(g)(4) of the Securities Exchange Act of 1934; or (x) any action similar to any of those ennumerated above. (Emphasis by Court)

On May 12, BLI filed an Amended Schedule 13D to reflect additional purchases of KIRSCH's stock, which had increased its share to approximately 9.6 percent of KIRSCH's stock as noted above.

Since 1961, BLI has had a long standing acquisition program, publicly announced and openly pursued, of growth through the acquisition of "Niche Businesses".[7] Since BLI's adoption of the policy in 1961, it has acquired approximately 18 companies; (Dep. of Worley 95; Shay 63–71); (P-Ex 3); and thus has diversified itself from its original cold finish steel bar business to three separate and distinct operating groups, namely; metal products, construction tools, land—plus many new product lines. (P-Ex 3).

In conjunction with its acquisition policy, Mr. Crigler, BLI's Vice President of Administration and Corporate Development, Treasurer, and Chief Financial Officer, in the late summer of 1979, began formulation of BLI's Stock Purchase Program (Crigler Dep 23, Collinsworth Dep 111–112).

The evidence indicates that several considerations prompted the necessity of such a Program, including: (1) a cash reserve of $30–40,000,000; (2) a continued difficulty in locating friendly mergers; (3) a possible threat that one or two of its large shareholders would seek to acquire control of BLI; (4) BLI's intent to use the equity method of accounting in the purchase of other companies' stocks.

### Cash Reverse

In May of 1979, BLI sold Waco Scaffolding Division for $13,000,000 (Garneau Dep at 14) (Sheehan 108). With the sale of its Waco Division, BLI could anticipate a cash reserve in the neighborhood of $40,000,000. (Collinsworth Dep 101–106, Crigler 24).

### Posner and Jacobs Interest

A second factor which led to the Stock Purchase Program revolved around BLI's

---

**7.** "Niche Businesses" defined by BLI are businesses occupying a dominate position in small well-defined areas of the market.

two largest shareholders: Pennsylvania Engineering, whose BLI holdings comprise approximately 8.1 percent of its outstanding common stock (Collinsworth Dep 76, P-Ex 14), and is controlled by Victor Posner; and Solar Sports Systems, Inc. (SSI), a subsidiary of Delaware North Companies, Inc.; whose holdings are estimated at 6.5 percent of BLI's common stock, and is controlled by Jeremy Jacobs or members of the Jacobs family.

On May 11, 1979, Pennsylvania Engineering filed a Schedule 13D in connection with its acquisition of 5 percent of BLI's outstanding shares. Collinsworth and Crigler were concerned about this because BLI possessed large cash reserves, thereby making BLI more vulnerable as a "target" for a take-over (Collinsworth–101) (P-Ex 12–14); and because of Mr. Posner's reputation for acquiring companies after a filing a 13D where he has just purchased relatively small amounts of stock in the "target". On May 18, 1979, a memo from Collinsworth to the Board was circulated with regard to Jacobs' and Posner's reputations in the financial world. (P-Ex 9) On May 24, 1979, a special meeting of the Board was held to discuss this situation.

During the following months, BLI's management continued to assess the impact of the Posner and Jacobs presence. On June 5, 1979, Mr. Sheehan, house counsel for BLI, prepared and circulated a memo to Collinsworth and Crigler entitled: "Procedure Regarding Company Takeover". In that memorandum, Sheehan analyzed Posner's take-over technique over a company by merely acquiring a very small percentage of its outstanding common stock. (P-Ex 19). As Sheehan concluded:

> If you can perceive, *with only a limited beachhead* Mr. Posner eventually *achieved* carte blanche *control of the company.* (P-Ex 19) (Emphasis by Court)

It is clear to the Court that, at least by this time, BLI's management recognized a "technique" which permitted "control", in certain corporate structures, by acquisition of far less than 100 percent of a "target's" stock. It is equally clear that BLI then understood the potential danger to it (Posner, Jacobs, or any other investor might "control" such a company as BLI), as well as the potential advantage to it (BLI might acquire effective "control" of another corporation if the proper criteria of the "target" existed).

Because of its concern about a possible take-over, BLI retained Intertel, a private investigation group, to look into Jacobs and Posner. Such investigation resulted in follow-up work performed by the investigating agency. In August of 1979, a private meeting was arranged between Collinsworth and Posner. Through a memo to the file from Collinsworth, it was disclosed that Posner was interested in acquiring 25 percent of the stock in BLI for equity accounting purposes (P-Ex 126).

Shortly thereafter, Collinsworth was asked to submit an affidavit attesting to the fact that Posner had "only" an investment interest in BLI (P-Ex 16). This request by Posner was, apparently, in support of his position regarding some security litigation pending in North Carolina. This language was altered to read that Pennsylvania Engineering Corporation has been a holder of common stock of BLI, from at least July 1978; and reflected Collinsworth's view of Posner's interest in BLI (P-Ex 15).

With regard to SSI, on September 20, 1979, SSI filed a Schedule 13D disclosing 5.1 percent ownership of BLI. (P-Ex 61). On October 1, 1979, Collinsworth advised the Board of Directors of BLI that the wording in SSI's 13D was "innocuous" regarding its investment purpose and that BLI would file suit with regard to this matter. (D-Ex 10).

On October 12, 1979, BLI filed suit in the Northern District of Illinois, alleging that SSI's 13D was "false, misleading and incomplete" because it stated that the SSI intent in acquiring BLI stock was "for investment purposes" rather than to acquire control of their steel division.[8] Collinsworth, in his

---

8. Jeremy Jacobs, who controls Ramco Corporation, was a competitor with BLI's Steel Division for the Eastern market.

deposition, and on the stand, characterized SSI's Item 4, Schedule 13D as "innocuous" regarding . . . investment purposes and said that it could apply to BLI's May 1, 1980, Schedule 13D as it relates to KIRSCH (Collinsworth Dep 166, 167). This suit against SSI was dropped only after SSI amended its 13D to reflect its true purpose.

The Court thus observes that, as a factual matter, the Chief Executive Officer of BLI regarded the SSI 13D as containing false, but "innocuous" information with regard to the purpose of the acquisition of BLI stock by SSI. More damaging, however, is the characterization, by Collinsworth, that BLI's 13D, with regard to KIRSCH, was *equally* "innocuous"; and I find that, as a matter of fact, the BLI 13D was intended by Collinsworth to be "false, misleading, and incomplete". Posner was the instructor, and Collinsworth the attentive student.

### BLI's Difficulty in Consummating Friendly Mergers

BLI's modus operandi had always been to acquire friendly companies (Niche Businesses). This technique became increasingly difficult because of the "stigma" attached to BLI as a result of its two largest shareholders, Posner and Jacobs.

The most dramatic evidence of BLI's problem was demonstrated by its attempt to consummate a friendly merger with Easco Corporation. In November of 1979, BLI held preliminary discussions with Bradford Ventures, (who represented a large shareholder of Easco). Discussions were not able to get beyond the preliminary stage, because of the ownership by Jacobs of a significant percentage of BLI.

In a memo to the file by Collinsworth (P-Ex 18), he indicated that Brad Mills, President of Bradford Ventures, informed him that, based upon a conversation with some of his associates, Easco[9]:

9. The Bessemer group holds approximately a 15 percent ownership in Easco (P-Ex 18).

10. This conclusion was based on Cornwell's direct testimony that acquisitions are a high

. . . could not knowingly go to bed with Jacobs . . . and that . . . the Board of Easco would definitely not stand for this and they would be in terror of the facts . . . (P-Ex 18).

In addition, Mills also stated to Collinsworth that:

you are going to have to get clear of this problem before you can get any money from the establishment. (P-Ex 18).

This difficulty of friendly mergers was acknowledged by Collinsworth. (Dep 68, 69).

### Equity Method of Accounting

The equity method of accounting allegedly permits the holder of 20 percent or more of an issuer's securities to reflect, in its own profit and loss statements, a share of the issuer's profits or losses proportionate to its percentage ownership in the issuer. This method of accounting is based on the presumption that, absent facts to the contrary, a shareholder who owns 20 percent or more of an issuer's securities *has the ability to control or exercise significant influence over the issuer.* (APB Op. No. 18, P-Ex 31a) (Emphasis by Court)

On March 13, 1980, Mr. Underwood from Anderson & Company responded to Crigler positively as to the application of the equity method of accounting in BLI's stock investments (P-Ex 24). Such a response was encouraging, and became part of the Option Paper for the Board's consideration at its March 26, 1980 meeting.

At the hearing, Mr. Cornwell, Vice President of Investment for Goldman & Sachs, testified that, in his opinion, as an expert, BLI desired to obtain a 20 percent interest in KIRSCH. Such observation, he stated, was based on examination of BLI's annual report, proxy statements, and other public information. The fact that BLI is an operating company rather than an investment company was also taken into consideration.[10]

priority of the company and that BLI would have purchased shares in a larger company if it wanted a good return, so it could be sold easier at a later time.

This last statement was refuted by an affidavit of Robert Smith, Vice President of Jeffreys Company, who stated that, in his opinion:

I believe that Jeffreys could probably sell the approximately 250,000 shares of Kirsch stock held by BLI, over a period of which might be a couple of months, without disrupting the market or significantly affecting the market price for Kirsch stock. (D-Ex 134) [11]

### The Implementation of the Stock Purchase Program

In the summer of 1979, there was no indication that an acquisition would be consummated by the end of the year, so Collinsworth, President of BLI and the Chief Executive Officer, instructed Crigler to develop a stock purchase plan based on "under valued businesses".[12]

After the concept of the program was approved by the Board, Crigler, with the help of Allan & Company, an investment banking firm, prepared a list of companies for BLI's Stock Purchase Program the purpose being "investment with added appeal of being a potential acquisition". (P-Ex 33).

At the hearing, Collinsworth testified that an option considered in selecting "investment candidates" was the acquisition of the company whose shares were being purchased. (Collinsworth Dep 117)

Furthermore, from the record, it was clear that the Stock Purchase Program was designed "to utilize the available 40 million dollars of cash to produce increased reported earnings to support our acquisition plans by purchases of select companies" (P-Ex

20). Because Allen & Company could not find an acquisition company, BLI temporarily terminated their relationship with Allen & Company, replacing it with Tweedy Brown, a New York brokerage firm.

In late 1979 and early 1980 Tweedy Brown screened approximately 50,000 companies, and narrowed the list to 49 possible companies for BLI's stock program.[13] After a detailed study of public information concerning each of the 49 companies, the list was narrowed to 5.[14]

What followed was a series of analyzations and projections which led up to a prioritization based on desirability. KIRSCH was either one or two on this priority list.[15]

On February 4, 1980, the Stock Purchase Program was implemented with purchase of KIRSCH's stock along with purchases of stock of the other 4 companies. Immediately thereafter, Crigler prepared a report on the "Stock Purchase Program" in which he summarized BLI's intent regarding the Program. (P-Ex 20)

We have initiated a program to utilize the available 40 million dollars of cash to produce increased reported earnings and support our acquisition plans by purchasing shares of selected companies.

Later, on February 19, 1980, Collinsworth, in a memo to the Board of Directors, stated that: "After analysis and refinement, certain select stocks may be *targeted* for increased activity". (P-Ex 1) (Emphasis by the Court)

In further preparation for the March 26 Board of Directors meeting, Collinsworth sent to the Board a briefing paper regarding the Program and future corporate strategy. In this paper Collinsworth stated:

**11.** During the testimony, counsel for BLI moved for admission of this affidavit. The affidavit was received into evidence with a chance for the Plaintiff to counter it. Plaintiff did not do so.

**12.** See pages 5 through 10 factors leading up to this decision.

**13.** This was based on such financial criteria as: (a) price earnings ratio; (b) possibility of acquiring 20 percent or more of the shares of the

company (Tweedy Brown Dep 42–43; 87; P-Ex 21).

**14.** BLI purchased shares of a sixth company but it was not one of the five selected by Tweedy Brown, Inc.

**15.** Tweedy Brown, on its list, had ranked KIRSCH as number one. There is conflicting testimony as to whether KIRSCH was the number one or number two priority of BLI according to BLI's list.

As you know, the major thrust of BLI's acquisition program policy is to purchase specialized "niche businesses" which enjoy strong market positions in their respective fields. Last summer it was reported to you that the possibilities for a 100% purchase of these types of businesses was becoming extremely difficult. In view of this, in considering our strong balance sheet position, the Board then gave management its approval to expend the company's cash *in the purchase of companies* that fell within this category. (Emphasis by the Court)

Prior to the Board meeting, Sheehan, discussed with Crigler, and Collinsworth, the issue of stopping the purchase of all stock in the other companies but KIRSCH because of the potential filings of 13D's with regard to all the companies and the possible litigation associated with it (Sheehan Dep 123–124).

At the March 26 meeting of the Board it was agreed, that BLI would stop short of the 5 percent level in all the companies but one. A meeting later that day, at the request of Collinsworth, took place between Messrs. Sheehan, Crigler and Aughnay, BLI's Vice President for Operations. The purpose of this meeting was to identify the potential acquisition candidates and to discuss prioritization of the six companies in the program. Sheehan, Crigler and Aughnay selected KIRSCH as number one or two on the list from which BLI would exceed the five percent level. (Sheehan Dep 125, 126).

In April of 1980, BLI instructed Tweedy Brown to locate large blocks (50,000 or more) of KIRSCH stock. When Tweedy Brown was then unable to locate these large blocks, BLI instructed Jeffreys & Company, of Los Angeles, whose specialty is purchasing large blocks of publicly owned companies, to locate and purchase such large blocks of KIRSCH's stock on behalf of BLI. Jeffreys was not at this time able to locate such large blocks of KIRSCH, so Tweedy Brown was given instructions to purchase KIRSCH on the open market regardless of the amount of shares being sold.

(This was contrary to the earlier advice from BLI to Tweedy Brown, which advice required smaller, more isolated, and less noticeable purchases.)

The "hunt" for KIRSCH stock was being accelerated by BLI.

On April 30, 1980, BLI held its monthly board meeting. Mr. Underwood, of Arthur Anderson & Company, came to the meeting to report to the Board on the status of the equity accounting method. At this meeting, Underwood indicated to the Board that there was less certainty as to its applicability then previously reported. (Shay Dep 166–167) At this meeting, it was reported that BLI was going over 5 percent ownership of KIRSCH's stock.

The day after this Board meeting, BLI proceeded to file its Schedule 13D. (P-Ex 27). On May 2, 1980, Jeffreys located a 50,000 share block of KIRSCH, which it purchased on behalf of BLI. On May 6, 1980, an additional 50,000 share block was purchased for BLI. This resulted in the amended Schedule 13D being filed by BLI (P-Ex 41).

Disregarding, for the moment, a draft of the 13D prepared by BLI (which draft disclosed, among other matters, a "gaining control of KIRSCH" intent by BLI, and which draft is discussed, infra) this Court finds that:

BLI was, by its history and its corporate motive, acquisition-oriented; was "frightened" by the threats, real or imagined, posed by the Posner and Jacobs interests; was frustrated, by those interests, in its acquisition attempts and motives; had learned, from Posner and others, the advantages of equity accounting; had discovered that a 20 percent interest in the "right kind" of corporation could serve its purposes in acquiring "niche" businesses; had identified KIRSCH as the "right kind" of "niche" business; had identified KIRSCH as possessing, also, other qualities (thinly traded stock, ownership of existing shares not closely controlled by a group, etc.); had instructed the brokers to purchase shares in small blocks (so as to disguise its acquisition intent, as well as to keep the market price

as low as possible) of the five "finalists" remaining from its sophisticated identification of "niche" businesses it might acquire; had "targeted" KIRSCH as *the* corporation to "go over" on the purchase of 5 percent of a company's shares; had, then, decided to purchase large blocks, after passing the 5 percent level; had, consequently, then quickly acquired nearly 10 percent of KIRSCH; and fully intended to purchase at least 20 percent of KIRSCH . . . without disclosing its intention on either its original 13D, or its subsequent amendment.

### Statutory Framework

Before considering the substantive issues in this case, a brief synopsis of the history and purpose of the Williams Act, particularly 13(d) is appropriate.

In the late 1940s and 50s, US industry began to experience profound changes in the structure of corporate enterprises as a result of a steadily increasing wave of corporate acquisitions. This acceleration process continued into the 1960s whereby acquired manufacturing and mining assets which approximated 2.3 billion in 1960 (800 acquisitions) had increased to 20 billion by 1969 (2200 acquisitions).[16]

This rapid spurt of growth in acquisitions is best described in a 1971 house anti-trust subcommittee staff report on conglomerate corporations:

In 1968, the merger movement was of such magnitude that in a single year nearly 10 percent of all independent manufacturing corporations in the $10 million asset class were acquired. Such large corporations as a class, according to the FTC, accounted for 86 percent of all corporate manufacturing assets and 88 percent of all corporate manufacturing profits.[17]

It was this insatiable appetite of the new corporate entrepreneur which provided the impetus for the regulation of cash tender offers under the security laws.

In October, 1965, Senator Williams (NJ) introduced the first bill to regulate such offers, describing such legislation as being for the purpose of protecting incumbent management from "industrial sabotage" resulting from reckless corporate raids on "proud old companies".[18]

Although no hearings were held on this bill, it laid the groundwork for a second bill introduced by Senator Williams in 1967.[19]

Senator Kuchel, co-sponsor of the legislation in support of requiring takeover bidders to disclose their activity stated:

Today there are those individuals in our financial community who seek to reduce our proudest businesses to nothing but corporate shells. They seize control of the corporation with unknown [sources], sell or trade away the best [assets], and later split up the remains among themselves. The tragedy of such collusion is that the corporation can be financially raped without management or shareholders having any knowledge of the acquisitions. . . . the corporate raiders may thus act under a cloak of secrecy while obtaining the shares needed to put [them] on the road to a successful capture of the company. *Piper v. Chris-Craft Industries*, 430 U.S. 1 at p. 28, 97 S.Ct. 926, at p. 942, 51 L.Ed.2d 124 (1977) quoted from 113 Cong.Rec. 857–858 (1967).

Although the sponsors of the legislation were sensitive to the suggestion that the measure would favor one side or the other in control contests, it was clear that the intent of the legislation was designed for the sole purpose of disseminating needed information to the investor.

We have taken extreme care to avoid tipping the scales either in favor of management or in favor of the person making

**16.** Federal Trade Commission: *Economic Report on Corporate Merger*; (1969).

**17.** *Investigation of Conglomerate Corporations*; a report by the staff of the Anti-Trust Subcommittee, of the House Committee Judiciary, 92 Cong. at p. 1 (1971).

**18.** The remarks of Senator Williams, S. 2731, 111 Cong.Rec. 282–56–60 (October 22, 1965).

**19.** S. 510, 113 Cong.Rec. 854–56 (January 18, 1967).

the takeover bids. S. 510 *is designed solely to require full and fair disclosure for the benefit of investors. Piper v. Chris-Craft, supra,* at p. 31, 97 S.Ct. at 944 quoted from 113 Cong.Rec. 24664 (1967) (Emphasis supplied)

In 1970, the Williams Act was amended primarily for the purpose of expanding the scope of regulation by reduction of the amount of equity ownership needed to trigger the filing of the disclosure requirements of §§ 13(d) and 14(d) from ten percent to five percent.[20]

*Conclusions of Law and Additional Findings of Fact*

*Alleged Violations of Schedule 13D*

Pursuant to Regulation 13D the SEC has promulgated a disclosure form to be used in making the requisite filing under § 13(d).[21]

Item 4 of Schedule 13D requires purchasers of more than five percent of the securities of a company to:

State the purpose or purposes of the purchase or proposed purchase of securities of the issuer. If the purpose or one of the purposes of the purchase or proposed purchase is to acquire control of the business of the issuer, describe any plans or proposals which the purchasers may have to liquidate the issuer, to sell his assets or to merge it with any other persons, or to make any other major change in its business or corporate structure . . .

KIRSCH's primary contention is that, while this item of Schedule 13D calls for disclosure of a purchaser's plans and purposes, BLI has failed to describe accurately its purposes. BLI's purpose according to KIRSCH, was "to obtain control of Kirsch" (Plaintiff's brief—20). According to KIRSCH, BLI's Schedule 13D was inaccurate, since it stated that: "Shares of the issuers (Kirsch's) common stock . . . were purchased and being held for investment" (P-Ex. 27).

Whether BLI's statement was accurate in this context must be considered in light of the purposes of disclosure under § 13(d). In *GAF Corporation v. Milstein,* 453 F.2d 709 at p. 720 (CA 2 1971), the court noted:

. . . § 13(d) was intended to alert investors to potential changes in corporate control so that they could properly evaluate the company in which they had invested or were investing. Disclosure which is false or misleading subverts this purpose.

Thus, the central issue then, is whether the information in BLI's Schedule 13D would fairly apprise investors of BLI's intent with regard to potential changes in KIRSCH's corporate control?

KIRSCH argues that the statements contained in BLI's Schedule 13D are plainly contrary to BLI's plan to obtain control of KIRSCH. It is the Court's opinion that KIRSCH has shown that BLI had instituted additional plans that were not disclosed in the Schedule 13D.[22]

While I am mindful of Judge Friendly's caution that "It would be as serious an infringement of these (SEC) Regulations to overstate the definiteness of the plans as to understate them." *Electronic Specialty Company v. International Controls Corporation,* 409 F.2d 937 at p. 948 (CA 2 1969), I find that, of the facts herein presented, such is not the case.

I am inclined to believe that the information in BLI's Schedule 13D would not fairly apprise investors of BLI's intent with regard to potential changes in KIRSCH's corporate control. Although I realize that there is evidence to the contrary, I have little doubt that KIRSCH's shareholders and the investing public were not adequate-

---

**20.** Act of December 22, 1970, Pub.L. No. 91–567, 84 Stat. 1497.

**21.** § 13(d) of the Williams Act, requires certain public disclosures by persons acquiring substantial blocks of an equity security issued by a close ended investment company registered under the Investment Company Act of 1940. Within ten days after acquiring the beneficial ownership of more than five percent of a class of such security, a person must provide certain information to the issuer, to each exchange upon which security is traded, and to the SEC.

**22.** See pages 495 through 498 of this Opinion.

ly informed about possible courses of action BLI had considered and its policies or purpose behind the purchasing of KIRSCH's stock.

■ There is ample support from the facts for the finding that BLI did not adequately, or fairly, disclose all of its plans and purposes regarding its acquisition of KIRSCH's stock. From the record, the following is clear: that BLI had discussed plans to acquire a 20 percent equity investment in KIRSCH and had moved forward with such plans; that BLI had discussed its intention to review continually its position with respect to KIRSCH; that BLI had prepared an acquisition model; that BLI's modus operandi had been to acquire one company a year; that Collinsworth's private memoranda indicated the real concern that would affect a friendly merger because of its large stockholders, i.e. Posner and Jacobs; testimony from Cornwell, Vice President of Investment for Sachs & Goldman, opined that BLI's projected 20 percent interest in KIRSCH would be a wise business decision *only* if it was attempting to gain control; etc. (See previous findings) Considered separately, such facts might not be sufficient to make a prima facie case of control intent, but considered together they support the Plaintiff's theory, that BLI had intention to control KIRSCH through a combination of numbers and programs.

If these facts were not enough, consider what Plaintiff's counsel describes as the "smoking gun".[23] This "smoking gun" is one of a series of three drafts of the Schedule 13D filed by KIRSCH on May 2, 1980. Prior to the draft in question, a draft of a memo by Mr. Sheehan regarding BLI's investment program stated:

At the present time BLI has no specific plans concerning any investment. However, in conjunction with the systematic evaluation of the portfolio, BLI obviously reserves the right to recognize changing conditions and circumstances by taking *abrupt action* or instituting a different course of action in regard to any security. (P-Ex. 56) (Emphasis by Court)

In between the first draft and the Schedule 13D filed with the SEC, three additional drafts were composed (Exhibits 135, 136, 137). P-Ex. 135 is referred to as the "smoking gun" and has the word "final" written in pencil on the front. It appears that Sheehan had received a marked up version upon which rider four was to be included into the final draft. Rider four concerns Item 4. *Purpose of Transaction.* The significant difference in rider four as compared with the Schedule 13D that was filed with the SEC is the following paragraph that was deleted from the final Schedule 13D and reads as follows:

Depending upon such considerations, Bliss & Laughlin may also pursue other possible courses of action with respect to the Issuer, including (a) seeking control of the Issuer by purchasing additional securities in the open market, in private transactions, in a tender offer or exchange offer, or otherwise, (b) Proposing a merger or similar transaction between the Issuer and Bliss & Laughlin or an affiliate of Bliss & Laughlin or (c) seeking representation on the issuer's Board of Directors. However, no decision on any such course of action has been reached . . . (P-Ex. 135)

Apparently Sheehan had some questions about this rider and wrote under Item 5 in pencil "see me".

Exhibit 135 is convincing proof that either BLI's counsel, or someone else in management, thought it would be prudent to include such information in BLI's Schedule 13D.

Although this document is not in and of itself fatal, when it is taken with the preceding facts, it is sufficient to make a strong "preponderance" case of control intent on the part of BLI.

---

**23.** With regard to P-Ex 135, 136, 137, KIRSCH's counsel filed a Motion Compelling Production of these documents. BLI claimed that they were privileged information based on the attorney-client relationship. After an in camera inspection of these documents, and following a review of the applicable law, the Court granted KIRSCH's Motion upon which the documents were then introduced into evidence.

Support for a court's examination of intrinsic factors in determining whether a company had formulated intent to gain control can be found in *Chromalloy American Corporation v. Sun Chemical Corporation*, 611 F.2d 240 (CA 8 1979). Here, the court recognized that Item 4 of Schedule 13D required disclosure of a purpose to acquire control, even though their intention had not taken shape as a final and fixed plan. In *Chromalloy, supra*, the court also examined many intrinsic factors in determining whether or not Defendant had the intent to gain control.

BLI also contends *Gulf & Western Industries v. Great Atlantic & Pacific Tea Company*, 476 F.2d 687 (CA 2 1973), and *Chromalloy, supra*, does not support KIRSCH's proposition that a "company's past pattern of acquisitions may evidence an attempt to control notwithstanding its assertions of investment intent". (KIRSCH's brief at p. 32). Such assertion is made by BLI based on its contention that BLI unlike *Gulf & Western Industries, supra*, has no modus operandi of acquiring firms after initially purchasing a small percentage of outstanding shares. While this may be true, BLI's modus operandi in the past has included purchasing, on a yearly basis, small niche-businesses that are near the top in their field. (Crigler Dep. at 22–23; P-Ex. 3; Sheehan Dep. at 78–79; Shay Dep. at 178)

It is the Court's opinion that BLI's contention is unfounded and without merit.

### Preliminary Injunction Standards

In approaching KIRSCH's request for injunctive relief this Court must determine the standards which must be applied in this Circuit to request for injunctive relief. KIRSCH's memorandum refers to the traditional four part test annunciated by this Circuit in *Securities & Exchange Commission v. Senex. Corp.*, 534 F.2d 1240 (CA 6 1976) (per curiam). Here, the Sixth Circuit formulated the standards for preliminary injunctive relief by announcing four elements:

(1) that a substantial question is at issue;

(2) that there is a possibility of success on the merits;

(3) that a balancing of injuries to the parties requires preliminary injunctive relief; and

(4) that the public interest would be served by such preliminary relief.

BLI urges application of the standard of review as set forth in *Mason County Medical v. Knebel*, 563 F.2d 256 at p. 261 (CA 6 1977):

(1) whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;

(2) whether the plaintiffs have shown irreparable injury;

(3) whether the issuance of a preliminary injunction would cause substantial harm to others;

(4) whether the public interest would be served by issuing a preliminary injunction.

*Mason County Medical, supra*, clearly sets forth the current factors to be weighed by this Court, and control in considering the relief sought by KIRSCH.

### Relief

Although Plaintiff has demonstrated a strong likelihood of success on the merits of its § 13(d) claim, it must further demonstrate that irreparable harm will result from a 13(d) violation, unless injunctive relief is granted. *Rondeau v. Mosinee Paper Corporation*, 422 U.S. 49 at p. 60, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975); *General Aircraft Corporation v. Lampert*, 556 F.2d 90 at p. 96 (CA 1 1972).

In addition, since the court in *Rondeau, supra*, stated that the provisions of the Williams Act were not designed to assist incumbent management in its' resistance to takeover (422 U.S. at pages 58–59, 95 S.Ct. at pages 2075–2076), the harm threatened, must be substantial, not only to the Plaintiff KIRSCH, but to those whom § 13(d) was designed to protect, i. e., KIRSCH's shareholders and the investing public.

The Court applies the *Mason* standards on the granting of a temporary injunction to the specific prayers for relief requested by KIRSCH in the paragraphs which follow.

KIRSCH has sought the following relief, and the Court rules on each prayer ad seriatim:

1. *That BLI be enjoined from acquiring additional shares of KIRSCH Stock.*

■ Plaintiff has alleged that irreparable harm will occur to the investing shareholders of KIRSCH and to potential shareholders. While the Court recognizes that "the . . . injunctive process [is] designed to deter rather than punish", *Rondeau, supra,* at p. 61, 95 S.Ct. at p. 2077 quoted from *Hecht Company v. Bowles,* 321 U.S. 321 at p. 329, 64 S.Ct. 587 at p. 591, 88 L.Ed. 754 (1944), and that disclosure requirements established by Congress are not intended to provide a weapon for management to prevent large accumulations of stock, *Piper, supra,* 430 U.S. at p. 26, 97 S.Ct. at p. 941, the Court cannot overlook the *raison d'etre* of § 13(d) which is: "Full and fair disclosure for the benefit of the investors".

The Court is convinced, based upon the evidence, that irreparable injury would occur to present shareholders of KIRSCH and the investing public if BLI were allowed to continue its purchases of KIRSCH stock without correcting and amending its Schedule 13D.

The Court hereby Orders a suspension period of 30 days, whereby BLI is enjoined from acquiring further shares of KIRSCH stock. Such suspension period should not begin until BLI amends and files its Schedule 13D to reflect accurately, its intentions, and until BLI notifies each shareholder of record of KIRSCH as of July 3, 1980. *Chromalloy, supra; General Aircraft Corporation, supra.*

As to notice, BLI shall comply with the Manual of the New York Stock Exchange for the methodology for releasing important announcements of any company, and in accordance with the requirements of the NYSE Manual.

BLI shall, also, at the option of KIRSCH either:

(a) Notify each shareholder of record of KIRSCH as of July 3, 1980, by mailing, at BLI expense, a copy of its amended 13D, or;

(b) Pay to KIRSCH the expenses of such a mailing, in which event KIRSCH shall accomplish the mailing ordered by these paragraphs.

Defendants therefore are enjoined from acquiring additional shares of KIRSCH's common stock through open market and privately negotiated purchases until after this suspension period, and until after it has complied with this Court's Order with regard to 13D amendment and notice to shareholders.

2. *That Defendant be enjoined from voting those shares it presently holds until it files an amended Schedule 13D.*

■ The court is not convinced, from the record, that irreparable injury will result to existing shareholders of KIRSCH, or potential investors of KIRSCH, if BLI votes its stock presently owned.[24]

The Court, therefore, declines to rule that BLI may not vote its present KIRSCH stock, absent any showing by KIRSCH that such voting would cause irreparable injury.

3. *That BLI desenfranchise itself from the shares it has already purchased.*

■ In *General Aircraft Corporation, supra,* the court recognized that disenfranchisement may be an appropriate remedy, where shares were rapidly acquired immediately prior to a control contest during a period of time in which the purchaser was in violation of 13(d). In the instant case, such a disenfranchisement of a stock would be more like punishment than deterrence and not within the spirit of judicial equitable principles.

---

24. The last annual meeting was held in October of 1979. Assuming that the next annual meeting of KIRSCH is held in October of 1980, the Court feels that this issue is probably moot.

It is clear from the facts that BLI was in a stock acquisition program by which purchases of common stock of five or six companies were being purchased (D-Ex. 5, 35). Although BLI's intent in KIRSCH accelerated after the filing of the first Schedule 13D, the record shows that all additional purchases of KIRSCH stock were within the range at which Tweedy Brown recommended that it be purchased, such being $18 per share (D-Ex. 36a).

Investors are entitled to the legitimate fruits of their investment and, in the instant case, based upon the facts, and absent a clear showing of irreparable injury, the drastic relief of disenfranchisement would be inappropriate.

Furthermore, once again, KIRSCH has not convinced this Court that any irreparable harm will occur to KIRSCH and its shareholders should BLI not be mandated to sell.

It has been said, in a more cheerful environment than securities law:

"My object; all sublime;

I shall achieve in time;

to make the punishment fit the crime".
*The Mikado*, Act II.

4. *That BLI file an amendment to its Schedule 13D, correcting all misrepresentations and omissions contained therein and stating all facts required to be stated in order to make the statement not misleading.*

It is clear that both the letter and the spirit of the securities law calls for complete and unrestricted disclosure. At the same time, it is equally clear that the omission must be of a material fact. As the court stated in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 at p. 449, 96

S.Ct. 2126, at p. 2132, 48 L.Ed.2d 757 (1976): [25]

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote . . . Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available . . .

In other words, would a reasonable shareholder consider the information significant in making his investment decision?

A. *The Stock Purchase Program of BLI.*

■ The record indicates that this idea began in the spring or summer of 1979 in a meeting between Collinsworth, Crigler and Sheehan of BLI. Pursuant to the Program, a handful of companies engaged in "niche-businesses" would be selected for the Program and possibly one would lead to an acquisition candidate. (Collinsworth Dep. 72) In addition, one of the companies would be selected for increased stock purchases resulting in at least 20 percent ownership (Worley Dep. 97).[26] Furthermore, KIRSCH was given the number one or two priority in the Stock Purchase Program and was selected by BLI for increased purchases. (Sheehan Deps. 122–126)[27]

Under these facts, it is clear that, such a program would, doubtless, lead to a corporate change in the structure of KIRSCH. KIRSCH's shareholders and other investors who might invest in KIRSCH have the right to know such information before making decisions as to their investments.

**25.** Although *TSC* was concerned only with proxy solicitations lower courts have interpreted the materiality standard, applicable to the rest of the securities law as well. *Berman v. Gerber*, 454 F.Supp. 1310 (W.D. Mich. 1978); *Wheat v. Hall*, 535 F.2d 874 (CA 5 1976); *Piper v. Chris-Craft, supra.*

**26.** Counsel for BLI argued that Mr. Worley was confused when he made this statement. The Court disagrees. Mr. Worley is an outside director of BLI, and is currently Executive Vice President-Finance of Montgomery Ward & Company, Inc., a national retailer of general merchandise.

**27.** Mr. Sheehan, in his deposition, stated that they were concerned with going over 5 percent on more than one company because of possible 13D litigation.

Such a decision without the benefit of this type of information being disclosed could cause irreparable injury to the investing public.

### B. *The Equity Method of Accounting.*

■ The premise underlying the equity method of accounting ·is that a shareholder whQ owns 20 percent or more of an issuer's stock has the ability to exercise significant influence over the issuer (P-Ex. 31a; APB Op. No. 18; P-Ex. 24).

This presumption has been recognized by the courts in *Danriver, Inc., supra.*

> The defendants are looking to the purchase of approximately 20 percent of the outstanding equity stock in Danriver. Such an accumulation of stock in a publicly held corporation frequently is regarded as control of a corporation. At p. 22.

Mr. Crigler, in his deposition, (Dep. 59) stated that the equity method was discussed in the stock program. Discussions of the equity method continued during 1980, when Mr. Anderson responded to BLI's questions concerning such a method for its investments. Underwood, an associate of Arthur Anderson & Company, responded to BLI's questions about this method of accounting by stating:

> . . . it is appropriate for an investor to apply the equitable method of accounting when the investment exceeds 20 percent . . . however, we do not feel that the investor accounting should be determined or affected by the investee's perception of the investor's ability to exercise significant influence over the operating and financial policies of the investee. (P-Ex. 24).

Although Underwood, at the April meeting of BLI's Board of Directors, retreated from his position with respect to the applicability of this method to BLI's operations, from the reading of the record, it is my opinion that such a statement regarding the use of the equity method of accounting, with respect to KIRSCH is material and should be disclosed by BLI on its Schedule 13D.

This Court would agree with BLI, that at this point in its purchase program, with the acquisition of only 9.6 percent of KIRSCH's stock, it could not hope to exercise control. But, this "idea or plan" has been in existence since the development of the Stock Purchase Program.

The public investors have a right to know what BLI's intention is if it successfully acquires 20 percent of KIRSCH's stock under its plan. Will it seek control, or at least seek to influence the decisions and actions of the "target corporation"?

The present language in BLI's Schedule 13D does not answer this pivotal question for the shareholders of KIRSCH and other potential investors. It should.

### c. *Disclosure of BLI's fear of a possible takeover.*

KIRSCH contends that BLI should disclose the identities, backgrounds and consequences associated with BLI's two largest shareholders: Pennsylvania Engineering Corporation, which is controlled by Victor Posner; and Solar Sports Systems, Inc. (SSI), which is controlled by Jeremy Jacobs or members of his family.

Pennsylvania Engineering Corporation is BLI's largest shareholder, with its holdings comprising approximately 8.1 percent of BLI's outstanding common stock. SSI is BLI's second largest shareholder. Its holdings comprise approximately 6.5 percent of BLI's outstanding stock (Collinsworth Dep. 76).

The record clearly indicates that a real concern, if not a fear, existed among the Management and BLI's Board of Directors with regard to the two largest shareholders of the company.

Such concern was predicated on the fact that Messrs. Posner and Jacobs ownership in BLI stymied any chance of BLI to acquire niche-businesses by way of friendly acquisitions. This frustration led, in part, to the formation of BLI's Stock Purchase Program (together with its large cash reserve, which it believed made it vulnerable to Posner and Jacobs).

Although evidence does not reflect any intent by Posner and Jacobs to acquire control as part of a group,[28] there is evidence indicating that Posner and Jacobs separately wanted to acquire a greater interest in BLI. Whether the above requires BLI to disclose this information on a Schedule 13D requires analysis and resolution.

Such information regarding SSI's and Pennsylvania Engineering Corporation's holdings in BLI is publicly disclosed in BLI's third quarter report (P-Ex. 127), and other public documents.

■ With regard to SSI, an amended Schedule 13D was filed by the Company indicating its purpose. This included Jeremy Jacobs' conversation with Collinsworth regarding an interest in a possible exchange of certain assets of the steel division of BLI for common stock of BLI held by SSI. Item 4 of SSI's Schedule 13D states:

> The securities of the Issuer were acquired for investment purposes. Depending on various factors including, but not limited to, the price of the Common Stock of the Issuer, and the terms and conditions available from time to time for its purchase or sale, SSI may at anytime or from time to time determine to purchase additional shares of the Issuer or to sell some or all of the shares of the Issuer presently held by SSI.

> In June or July, 1979, prior to the filing of the Schedule 13D to which this Amendment Number 1 pertains, in a telephone conversation with E. T. Collinsworth, Jr., Chief Executive Officer of the Issuer, Jeremy M. Jacobs expressed an interest in a possible exchange of certain assets of the Steel Division of the Issuer for the Common Stock of the Issuer then held by SSI. This expression of interest

was rejected. Competition exists to some degree between the Issuer's Steel Division and a subsidiary of SSI and companies controlled by SC in the manufacture and sale of cold finish steel bar products. Neither SSI nor any other reporting person hereto has any plan or proposal to acquire the Issuer's Steel Division or any other assets of the Issuer. However, depending on various factors, SSI (or an affiliate of SSI) would consider a proposal for such an exchange as described above, or would consider a proposal for the acquisition by the Issuer of the stock held by SSI either alone or together with the cold finish steel bar production facilities owned by the affiliated companies of SSI and SC.

Neither SSI nor any reporting person on this Schedule 13D has under consideration any plans or proposals which relate to or would result in a merger, reorganization or liquidation of the Issuer or any of its subsidiaries, the sale or transfer of a material amount of the assets of the Issuer, any change in the Issuer's management, any change in the capitalization or dividend policy of the Issuer, any other material change in the Issuer's charter or by-laws (or any other action) which may impede the acquisition or control of the Issuer by any person, any action causing a Common Stock to be delisted from the New York Stock Exchange or causing the Common Stock to be eligible for termination of registration pursuant to Section 12(g)(4) of the Exchange Act, or any actions similar to those enumerated.

SSI will, however, continue to evaluate its position in light of any changing circumstances and reserves the right to take such action in the future as it deems to be in its best interest.

**28.** "The term 'control' (including the terms 'controlling', 'controlled by' and under common control with) means the possession, directly or indirectly, of the power to direct or cause the direction of management, and policies of a person, whether through the ownership of voting securities, by contract or otherwise." 17 CFR § 12b-2(f) made applicable to 13D filings by 17 CFR § 240 12b-1. The term "group" within the meaning of § 13(d)(3) provides that:

> When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding or disposing of securities of an issuer, such syndicate or group shall be deemed a person for the purpose of [13(d)]. 15 U.S.C. § 78m(d)(3).

SSI's Schedule 13D is public information and therefore is available to all investors. Therefore, as to SSI, no additional information need be provided by BLI in its Schedule 13D.

On the subject of Pennsylvania Engineering Corporation and Mr. Posner, it is the Court's opinion, based on the evidence presented, that sufficient disclosure of Pennsylvania Engineering's interest in BLI has not been satisfied.

Although Pennsylvania Engineering's interest in BLI might be satisfied by public disclosure, in BLI's proxy statement, or third quarter report, the record indicates that: (1) Mr. Posner has a reputation for acquiring businesses with as little as five percent interest in the company; (2) A meeting occurred between Mr. Collinsworth and Mr. Posner, whereby Mr. Posner expressed a desire to acquire a 25 percent interest in BLI for the purpose of equity accounting (P-Ex. 126); (3) Posner asked Collinsworth to prepare an affidavit on his behalf swearing that Posner's interest in BLI was for investment purposes only (P-Ex. 15). Collinsworth would not swear to such a statement and instead indicated in his affidavit:

> . . . currently, Pennsylvania Engineering owns approximately 7.1 percent of the outstanding common stock of Bliss & Laughlin Industries, Inc. At no time has Pennsylvania Engineering Corporation or any other companies related to NVF Company had or sought to have a representative on the Board of Directors of Bliss & Laughlin Industries, Inc. or sought to exercise any influence over the management or policies of Bliss & Laughlin Industries, Inc.

Such information with regard to Mr. Posner is material, and is not disclosed in any public documents upon which an investor could rely. The Court Orders that the above information, with respect to Posner's interest in acquiring 25 percent interest in BLI, be disclosed in BLI's amended Schedule 13D.

The Court further directs BLI to amend its Schedule 13D at any time, in which it continues to exercise jurisdiction, that further developments occur between BLI and Jacobs/Posner regarding the issue of "control" of BLI.

Finally, this Court directs BLI to the "smoking gun" draft of its 13D (P-Ex. 135), as a threshold, for its court mandated filing of an amended 13D which will fully and fairly disclose its interest in KIRSCH.

5. *That this Court Award Costs and Attorney Fees.*

The Court will take this issue under advisement to see what further developments occur as a result of this decision. The Court reserves its right to assess Court costs and attorney fees, pending final disposition of this matter.

*Should BLI Offer to Rescind?*

KIRSCH did not request any remedy regarding BLI's offering to rescind any of its purchases of KIRSCH stock. Nor did KIRSCH offer any evidence that such sellers have been irreparably harmed. The Court notes that at least one District Court has included this relief as part of its injunctive order against a non-complying 13D filer. *Financial General Bankshares, Inc. v. Lance,* (DC D of C March 9, 1979) 1979 CCH Dec. 96,798.

However, at this time, and without further evidence, this Court declines to order BLI to make such an offer of recission. In so declining, the Court is not unaware that two large blocks of KIRSCH stock were purchased by BLI *after* the first Schedule 13D was filed.

*Conclusion*

An Injunctive Order will issue from this Court consistent with this Opinion. As disclosed by the preceding paragraphs, some of the temporary relief sought by KIRSCH has been granted, and some denied. The Court believes that the relief granted by its Order is consistent with Congressional intent and is necessary to prevent irreparable harm to KIRSCH, its shareholders, and the investing public.

The 30 day suspension of the purchase of KIRSCH stock by BLI is intended, by this Court, to give the market an opportunity to "settle"; to give KIRSCH shareholders and the investing public an opportunity to consider BLI's relationship to its own shareholders, and to KIRSCH; and to give previous sellers of KIRSCH stock to BLI an opportunity to consider their positions.

It does not appear that the relief, herein granted, will tip the scales either in favor of KIRSCH management, or in favor of BLI. Instead the Order, which follows, is intended to rectify the situation caused by BLI's filing of misleading 13D's on KIRSCH, and to alert investors to potential changes in corporate control so that they may evaluate, properly, the companies involved. The past filings have subverted this purpose.

Once the cloak of secrecy has been lifted, by requiring herein the filing of an Amended 13D, and a short period of suspended purchase, by BLI of KIRSCH stock; KIRSCH shareholders and the investing public will have had the opportunity to make proper evaluations of KIRSCH. The Order should, also, maintain, as closely as possible, the status quo between the parties, before trial of the ultimate issues involved.

An expedited discovery process and trial will follow.